David E. Bower (SBN 119546)
MONTEVERDE & ASSOCIATES PC
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Co-Lead Plaintiffs and*
*Co-Lead Counsel for the Putative Class*

[additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| ARMIN WASICEK, DEVENDRA MODIUM, and RANJIT KAPIL, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiffs,<br><br>   v.<br><br>SUMO LOGIC, INC., RAMIN SAYAR, and STEWART GRIERSON,<br><br>         Defendants. | Civil Action No. 4:23-cv-3665-BLF<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED**<br><br>HON. BETH L. FREEMAN |

Co-Lead Plaintiffs Armin Wasicek, Devendra Modium, and Ranjit Kapil ("Plaintiffs"), on behalf of themselves and the putative Class defined below, by their undersigned attorneys, allege as follows based upon personal knowledge with respect to their own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings and other publicly available information.

## NATURE OF THE ACTION

1.    Plaintiffs bring this putative class action against Sumo Logic, Inc. ("Sumo Logic"

or the "Company"), its former chief executive officer Ramin Sayar ("Sayar"), and its former chief financial officer and current chief operating officer Stewart Grierson ("Grierson", and, together with Sumo Logic and Sayar, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.    Plaintiffs' claims arise in connection with the solicitation of public stockholders of Sumo Logic to vote in favor of a merger transaction ("Merger") pursuant to which Sumo Logic merged into an affiliate of Francisco Partners Management, L.P. ("Francisco Partners"), in exchange for $12.05 per share in cash ("Merger Consideration").

3.    On February 9, 2023, Sumo Logic announced that its board of directors ("Board") had approved the sale of the Company to Francisco Partners, pursuant to a merger agreement ("Merger Agreement").

4.    On April 5, 2023, Defendants caused a materially false and misleading definitive proxy statement on Schedule 14A ("Proxy") to be filed with the SEC and disseminated to Sumo Logic stockholders, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.[1]

5.    As detailed below, the Proxy contains statements that are false or misleading with respect to material facts, in violation of the above-referenced Exchange Act provisions and Rule 14a-9.

6.    The special meeting of Sumo Logic stockholders to vote on the Merger was held on May 10, 2023. 84,039,824 of the 124,088,187 outstanding shares of Sumo Logic common stock voted to approve the Merger. As a result of the materially false and misleading Proxy, shareholders were misled when they voted to approve the unfair Merger, which closed on May 12, 2023.

7.    Plaintiffs seek to recover damages suffered by Plaintiffs and other similarly

---

[1]   The Proxy is referenced herein for the purpose of identifying and discussing the challenged materially false and misleading statements. Plaintiffs do not incorporate all of the Proxy's numerous and unverified factual assertions into this Amended Complaint.

AMENDED CLASS ACTION COMPLAINT

situated former Sumo Logic stockholders as a result of Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9.     Personal jurisdiction exists over each Defendant. This Court has jurisdiction over Sumo Logic because the Company maintains its principal executive offices in Redwood City, California, which is within this District. This Court has jurisdiction over the remaining Defendants because each conducted business in this state by serving as an officer of Sumo Logic, which was led from this District. Moreover, "[w]here a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Sumo Logic maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11.     Plaintiffs were, at all relevant times, holders of Sumo Logic common stock.

12.     Defendant Sumo Logic is a Delaware corporation with its principal executive offices located at 855 Main Street, Suite 100, Redwood City, California 94063. Before the Merger, Sumo Logic's common stock was listed on the Nasdaq Global Select Market. Sumo Logic survived the Merger as a wholly owned subsidiary of Serrano Parent, LLC, an affiliate of

Francisco Partners.

13.    Defendant Ramin Sayar served as Sumo Logic's chief executive officer ("CEO") and as a member of the Board at all relevant times.

14.    Defendant Stewart Grierson served as Sumo Logic's chief financial officer at all relevant times, and became Sumo Logic's chief operating officer immediately following the completion of the Merger.

## SUBSTANTIVE ALLEGATIONS

### I.    Defendants and the Board Elect to Sell Sumo Logic For Inadequate Consideration and Prepare Unreasonably Low Financial Projections to Justify the Deal

15.    Sumo Logic provides cloud-based software-as-a-service solutions that enable organizations to, among other things, ensure the reliability and security of cloud applications and workloads, including detecting security threats, automating security responses to remediate threats, and performing security analysis and forensics. The Company completed four acquisitions of smaller cybersecurity companies from 2018 to 2021, averaging one acquisition per year.[2] Sumo Logic used these acquisitions to develop its technology and expand its customer and revenue base.

16.    In September 2020, Sumo Logic completed its initial public offering at a price of $22.00 per share. Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in Sumo Logic's initial public offering, and received fees of $5 to $10 million for services it provided to Sumo Logic during the two-and-a-half-year period preceding the Merger.

17.    After relying on Sumo Logic's stockholders to fund the Company's operations for its first two years as a public company, Sumo Logic began generating strong financial results during its 2023 fiscal year, and had strong prospects for future growth as a stand-alone entity. As is common, private equity firms eager to purchase undervalued companies at bargain basement prices just before their financial performance takes off began to pursue an acquisition.

18.    On June 3, 2022, representatives of Francisco Partners contacted Sumo Logic director Charles Robel to request a meeting. Thereafter, on June 6, 2022, Francisco Partners provided

---

[2] The acquired companies were Factor Chain (acquired 2018), JASK (acquired 2019), DF Labs (acquired 2021), and Sensu (acquired 2021).

Sumo Logic with a proposal to acquire Sumo Logic for $11.00 in cash per share. In response to the offer, Defendants and the Board conveyed their (i) belief in the strength of Sumo Logic's prospects as an independent public company, (ii) expectations for Sumo Logic to deliver strong financial results for the remainder of its 2023 fiscal year, and (iii) belief that investors would be pleased with the information shared at the Company's upcoming investor day, during which Defendants and other members of Sumo Logic's management team would provide additional details on the Company's business and financial plan, path to profitability and strategic vision.

19.    On August 25, 2022, Sumo Logic announced earnings for the second quarter of its 2023 fiscal year. Sumo Logic exceeded the guidance that it had provided to the market with respect to Sumo Logic's total revenue, non-GAAP operating margin and non-GAAP net loss per share for that quarter. Sumo Logic's second quarter fiscal 2023 revenue was $74.1 million, an increase of 26% year over year. Defendants also told the market that, for the third quarter of fiscal 2023, they expected total revenue between $73.5 million and $74.5 million, representing 19% to 20% growth year-over-year, and that, for the full fiscal year 2023, they expected total revenue between $289.0 million and $293.0 million, representing 19% to 21% growth year-over-year.

20.    On September 20, 2022, Sumo Logic held its investor day, during which Defendants Sayar and Grierson along with other members of Sumo Logic's management team explained Sumo Logic's business and financial plan, path to profitability and strategic vision. Sumo Logic's investor day presentation included the following slides:



21.    During the investor day call, Defendant Grierson stated:

So let me just share some key metrics to orient you on our current scale. This is as of Q2 of FY '23. So this is July 31 of this year. So let me start with ARR or annual recurring revenue. So we think – we share this metric because we think this is the leading indicator of growth for a SaaS business. At the end of Q2, we delivered $286.2 million of ARR, which represented 25% year-over-year growth. Let's talk about our revenue model. So most of our revenue is subscription in nature with our contracts typically being 1 to 3 years in duration. We're not a consumption model.[3] There's been some confusion about this in the market, but we're not a consumption model. We recognize revenue ratably over the term of the contract. **This gives us really strong forward visibility and predictability around our revenue.**

22.    On October 3, 2022, the Sumo Logic Board met, with members of Sumo Logic management and representatives of the Company's outside legal advisor, Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini") in attendance. The Sumo Logic Board determined to explore the possible retention of an investment bank to provide financial advice in conjunction with any third party offers to acquire the Company. The Sumo Logic Board also instructed Messrs. Robel and Sayar to meet with representatives of Francisco Partners to better understand the current state of Francisco Partners' objectives with respect to Sumo Logic. The Board understood that a common tactic for private equity firms interested in a buyout is to acquire shares and threaten a proxy contest if its demands are not met.

---

[3] A "consumption model" refers to a SaaS business model that features usage-based rather than subscription-based pricing.

AMENDED CLASS ACTION COMPLAINT

23.    In the days following October 3, 2022, Sumo Logic contacted Morgan Stanley, which was then retained to act as the Company's financial advisor on or around November 4, 2022. Even though Francisco Partners had already made an acquisition proposal, Defendants and the Board did not inquire about Morgan Stanley's ties to Francisco Partners at this time. It was not until Morgan Stanley made relationship disclosures on February 6, 2023—two days before Sumo Logic entered into the Merger Agreement—that Defendants and the Board learned of Morgan Stanley's prior ties to Francisco Partners, including that during the previous two years Morgan Stanley received fees of approximately $1.0 million from Francisco Partners or certain of its affiliates.

24.    On October 10, 2022, Francisco Partners expressed their continued interest in acquiring Sumo Logic.

25.    On October 14, 2022, representatives of a potential financial sponsor acquiror, referred to as "Sponsor A", contacted Defendant Grierson. The representatives of Sponsor A expressed Sponsor A's admiration for Sumo Logic and stated that Sponsor A had accumulated a position in Sumo Logic common stock through open market purchases. The representatives of Sponsor A also expressed Sponsor A's interest in being included in any strategic review process.

26.    On November 2, 2022, Francisco Partners provided Sumo Logic with a proposal to acquire Sumo Logic for $11.50 in cash per share.

27.    On November 4, 2022, the Sumo Logic Board met. Despite coming off a strong financial quarter, conveying Sumo Logic's strong stand-alone prospects to the market, and having just four months earlier deemed Francisco Partners' $11 per share offer insufficient to warrant further discussion, Defendants and the Board did a sudden about face, and now determined that Francisco Partners' $11.50 November proposal could be attractive and that it was appropriate to consider a sale.   The Board also delegated authority to its Corporate Governance and Nominating Committee ("Corporate Governance Committee") to oversee and assist Sumo Logic's management and advisors with respect to exploring and negotiating strategic alternatives. The Corporate Governance Committee was comprised of directors Sandra E. Bergeron, Tracey Newell, William D. (BJ) Jenkins, Jr., and Charles J. Robel.

28.    On November 15, 2022, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. After reviewing a list of counterparties that might have an interest in pursuing an acquisition of Sumo Logic developed by or with Morgan Stanley, the Corporate Governance Committee determined that Sumo Logic should pursue a targeted, private process. The Corporate Governance Committee further agreed that, as a first step in that process, representatives of Sumo Logic should meet with representatives of Francisco Partners to discuss its November proposal.

29.    On December 5, 2022, Sumo Logic announced its third quarter fiscal 2023 financial results, including that third quarter revenue grew 27% year over year to $79.0 million. The Proxy conspicuously fails to disclose that Sumo Logic's third quarter earnings beat Defendants' guidance.

30.    On December 7, 2022, the Sumo Logic Board met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The Sumo Logic Board discussed the conversations held to date with entities referred to as Sponsor A, Sponsor B and Sponsor C and determined not to include Sponsor A, Sponsor B or Sponsor C in the initial phase of the strategic review process.

31.    On December 13, 2022, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The members of Sumo Logic management described their expectations for Sumo Logic's operating and financial results for fiscal years 2024 through 2026.

32.    On December 27, 2022, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The members of Sumo Logic management reviewed with the Corporate Governance Committee a draft, prepared by Sumo Logic management, of Sumo Logic's preliminary long-range operating plan. In an unusual move, the outside directors that served on the Corporate Governance Committee directed Defendants to refine the plan based on their input.

33.    Over the following days, Defendants complied with the Corporate Governance

Committee's request to refine Sumo Logic's long-range operating plan based on the Corporate Governance Committee's input.

34.     The initial revision to the long-range operating plan was shared with the full Board on January 6, 2023. Yet again, the Company's outside directors instructed Defendants to refine the preliminary long-range operating plan based on their input.

35.     On January 10, 2023, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The Corporate Governance Committee approved the distribution by Morgan Stanley of a bid process letter to those potential acquirors that were still considering an acquisition of Sumo Logic, which would request written acquisition proposals be submitted by January 24, 2023.

36.     On January 13, 2023, the Sumo Logic Board met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The members of Sumo Logic management reviewed the twice-revised draft of Sumo Logic's long-range operating plan, which reflected the input received from the Sumo Logic Board at its meeting on January 6, 2023. The Sumo Logic Board approved providing this January 2023 long-range plan (the "January 2023 Long-Range Plan") to Morgan Stanley for purposes of its financial analyses of Sumo Logic and to potential acquirors.

37.     On January 16, 2023, representatives of a potential financing source referred to as "Financial A" in the Proxy contacted Morgan Stanley concerning Financial A's interest in making a minority investment in Sumo Logic. However, the very next day, the Corporate Governance Committee determined not to pursue discussions with Financial A.

38.     On January 17, 2023, representatives of Sponsor A contacted representatives of Morgan Stanley and expressed Sponsor A's interest in acquiring Sumo Logic.

39.     On January 18, 2023, the Sumo Logic Board met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The representatives of Morgan Stanley reviewed with the Sumo Logic Board preliminary financial analyses of Sumo Logic based on the January 2023 Long-Range Plan.

40.     On January 23, 2023, *The Information* published an article stating that private equity firms, including Francisco Partners, had approached Sumo Logic regarding an acquisition. The article noted that private equity firms had recently been on a software-buying spree, "taking advantage of low valuations to expand" in the area.

41.     After *The Information* article was published, several parties reached out to Sumo Logic to convey their interest in participating in the sales process. However, rather than seriously pursuing such interest, Defendants and the Board raced to finalize a deal with Francisco Partners. Indeed, Sumo Logic entered into the Merger Agreement with Francisco Partners just two weeks later.

42.     Seeking to wrap up the deal without further competition, on January 24, 2023, Francisco Partners submitted a proposal to acquire Sumo Logic for $11.95 in cash per share. Francisco Partners conveyed its eagerness to sign and announce the transaction within a week.

43.     On January 26, 2023, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The Corporate Governance Committee conveyed a desire for a purchase price per share in the teens. The Corporate Governance Committee also instructed Morgan Stanley to inform the parties that had conveyed interest since *The Information* article was published that they would need to act on an accelerated timeline. The Corporate Governance Committee also determined not to engage further with Sponsor A, Sponsor B or Sponsor C.

44.     In the days following the Board's January 27, 2023 meeting, Sponsor A continued to express interest in pursuing acquisition discussions and **expressed an ability to offer a price of approximately $13.00 in cash per share.**

45.     On January 31, 2023, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The Corporate Governance Committee authorized providing a draft merger agreement to Francisco Partners and Sponsor D, with instructions that such parties return a revised draft of the merger agreement with their acquisition proposals on or prior to February 3, 2023. In view of the interest expressed by Sponsor A, the Corporate Governance Committee also

authorized providing Sponsor A with the draft merger agreement, but only if Sponsor A expressed an ability to pursue an acquisition of Sumo Logic on an accelerated basis.

46.    Later on January 31, 2023, Sponsor A entered into a confidentiality agreement with Sumo Logic, which contained a standstill restriction. Sponsor A informed representatives of Morgan Stanley that it required 30 to 45 days to complete its due diligence.

47.    On February 2, 2023, representatives of each of Francisco Partners and Sponsor D met separately with members of Sumo Logic management and representatives of Morgan Stanley to discuss Sumo Logic's anticipated business and financial results for the fourth quarter of its 2023 fiscal year.

48.    On February 3, 2023, Francisco Partners provided Sumo Logic with a proposal to acquire Sumo Logic for $12.00 in cash per share. The February proposal noted that Francisco Partners was prepared to sign a definitive merger agreement and announce an acquisition of Sumo Logic within 48 hours.

49.    On February 5, 2023, the Corporate Governance Committee met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The representatives of Morgan Stanley reviewed the terms of Francisco Partners' February proposal from a financial point of view. The Corporate Governance Committee discussed that entities referred to in the Proxy as Strategic 4 and Sponsor K had stated an intent to enter into a confidentiality agreement with Sumo Logic, and that Sponsor A had stated that it required 30 to 45 days to complete due diligence. The Corporate Governance Committee instructed Morgan Stanley to inform Francisco Partners that the Sumo Logic Board was likely to be supportive of the February proposal but expected the acquisition price to (1) represent a premium to Sumo Logic's closing stock price on the trading day prior to announcement of a transaction; and (2) be no less than $12.00 in cash per share of Sumo Logic common stock. The Corporate Governance Committee also instructed Wilson Sonsini to negotiate the remaining terms of the merger agreement and the equity commitment letter with the goal of signing the merger agreement as soon as possible.

50.    On February 6, 2023, the Sumo Logic Board met, with members of Sumo Logic

management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The decisions of the Corporate Governance Committee were reviewed, along with the terms of the February proposal (including the terms of the revised merger agreement and equity commitment letter provided by Francisco Partners). The Sumo Logic Board was finally and belatedly provided with Morgan Stanley's relationship disclosures, which included disclosures regarding its prior relationship with Francisco Partners as well as Sumo Logic.

51.    On February 8, 2023, representatives of Morgan Stanley met with representatives of Francisco Partners. The representatives of Francisco Partners informed Morgan Stanley that Francisco Partners would not pay a premium to the closing price of Sumo Logic common stock on February 8, 2023 (which price was $12.18 per share), and would instead only increase the value of its proposal to $12.05 in cash per share of Sumo Logic common stock.

52.    Later on February 8, 2023, Defendants and the Board agreed to accept Francisco Partners' offer. The Sumo Logic Board instructed the representatives of each of Wilson Sonsini and Morgan Stanley to position Sumo Logic to be able to sign the Merger Agreement prior to the start of trading on Nasdaq on February 9, 2023.

53.    On February 9, 2023, the Sumo Logic Board met, with members of Sumo Logic management and representatives of each of Wilson Sonsini and Morgan Stanley in attendance. The representatives of Morgan Stanley reviewed Morgan Stanley's financial analyses of the final proposal. Morgan Stanley then rendered its fairness opinion. The valuation analyses underlying Morgan Stanley's fairness opinion relied upon the January 2023 Long-Range Plan and extrapolations thereto.

54.    Later on February 9, 2023, Sumo Logic and Francisco Partners publicly disclosed the signing of the Merger Agreement.

55.    At the close of trading that day, Sumo's stock closed *down* at $11.90 per share, reflecting the failure of the sales price to meet the market's expectations.

56.    The Merger closed on May 12, 2023.

57.    Immediately following the completion of the Merger, Defendant Grierson was promoted to chief operating officer of the surviving private Company – a less-scrutinized role

than an executive-level position at a public company – and received millions of dollars in cashed out equity interests.

58.     Further, the Merger allowed Defendant Sayar to unlock and liquidate the value of his equity interests in the Company. A substantial amount of his personal wealth was tied up in equity interests in the Company, which he could not significantly access without a liquidity event like the Merger. These interests were entirely cashed out in the Merger, for ***$42.9 million*** in total. This was a massive and personally transformative cash payday for Sayar that paid him many multiples of his ordinary course salary, which was a comparatively paltry $362,500 at Sumo Logic in FY 2022. His personal interests thus favored a sale over continuing to execute the Company's standalone plan.

59.     This payout was significant enough for Sayar that he has not taken on a new executive position since the Merger closed.

60.     Additionally, Katherine Haar, Sumo Logic's general counsel, and Jennifer McCord, Sumo Logic's senior vice president finance and chief accounting officer, were elected directors of the surviving Company. Ms. Haar continues to serve as Sumo Logic's general counsel, and Ms. McCord was promoted to Chief Financial Officer.

**II.     The Materially False and Misleading Proxy**

61.     To convince Sumo Logic stockholders to approve the unfair Merger, Defendants caused the materially false and misleading Proxy to be disseminated to the Company's public stockholders.

62.     Defendants prepared the prospective financial information for fiscal years 2024 through 2026 contained in the January 2023 Long-Range Plan, along with extrapolations for fiscal year 2027. Defendants also reviewed and approved the extrapolations for fiscal years 2028 through 2033, which were prepared by Morgan Stanley. The January 2023 Long-Range Plan and the extrapolations are defined in the Proxy as the "Projections", and are set forth on page 59 of the Proxy.

63.     The Projections were provided by Defendants to the Corporate Governance Committee and the Board for the purposes of their consideration, analyses and evaluation of the

Merger and other strategic alternatives.

64.    In preparing and approving the Projections, Defendants utilized a material assumption that they knew was entirely unreasonable and completely inconsistent with Sumo Logic's recent financial performance and their own genuine expectations for the Company's performance. Specifically, **Defendants prepared the Projections assuming a decline in revenue growth to just 14% for fiscal year 2024.**

65.    Defendants knew that preparing the Projections assuming a decline in revenue growth to just 14% in fiscal year 2024 was entirely unreasonable and completely inconsistent with Sumo Logic's recent financial performance and their own genuine expectations for the Company's performance.

66.    Indeed, Defendants knew that during Sumo Logic's third quarter of fiscal year 2023, Sumo Logic's revenue was $79.0 million, **an increase of 27% year over year.**

67.    Commenting on the third quarter 2023 results on December 5, 2023, Defendant Sayar stated: "**We delivered revenue growth of 27% year-over-year in the third quarter** while also driving better operating efficiencies, and will continue to emphasize efficient growth as we drive towards future cash flow break even and profitability…Our unified cloud-native platform for reliability and security continues to resonate with our customers and industry analysts as more customers are seeking to provide best in class digital experiences to their end users."

68.    During the third quarter 2023 earnings call held on December 5, 2023, Defendant Sayar stated: "We are pleased with the continued progress and strength in our business. We once again exceeded the high end of all of our guided metrics. In Q3, we delivered total revenue of $79 million, or **27% year-over-year revenue growth[.]**"

69.    On the same call, Defendant Grierson stated: "Thanks, Ramin. And thanks everyone for joining us on the call. I'd like to start with a brief summary of the financial highlights for the quarter and then go into more detail on each topic. First, as Ramin mentioned, **we've continued to deliver strong top line results with Q3 year-over-year revenue growth of 27%[.]**"

70.    In conjunction with Sumo Logic's third quarter 2023 earnings announcement, Sumo Logic also stated that it expected to achieve total revenue for the fully fiscal year 2023 between $298.0 million and $299.0 million, **representing 23% growth year-over-year**.

71.    On March 7, 2023, Sumo Logic announced its strong fourth quarter and fiscal year 2023 financial results, which included the following highlights: fourth quarter revenue grew 19% year over year to $79.8 million; **full year fiscal 2023 revenue grew 24% year over year to $300.7 million**.

72.    As illustrated by Defendants' above-referenced statements and Sumo Logic's financial performance immediately preceding and during the time that Defendants prepared the Projections, Defendants knew that assuming a decline in revenue growth to just 14% for fiscal year 2024 was wholly unreasonable and a false and inaccurate representation of Sumo Logic's financial prospects. Indeed, in December 2022 Defendants stated that they expected full fiscal year 2023 revenue growth of 23% year-over-year, and Sumo Logic ultimately achieved full fiscal year 2023 revenue growth of 24% year-over-year.

73.    Preparing the Projections by assuming a decline in revenue growth to 14% in fiscal year 2024 had a significant impact on all the projected metrics. Indeed, utilizing growth rates of 25% for 2024 and 2025—which is consistent with Sumo Logic's historical performance and expectations for 2026—results in the following metrics:

| Year | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue (Millions) | $342 | $413 | $520 | $665 | $850 | $1,070 | $1,291 | $1,502 | $1,680 | $1,805 |
| Growth Rate | 14% | 21% | 26% | 28% | 28% | 26% | 21% | 16% | 12% | 7% |
| Corrected Revenue (Millions) | $376 | $470 | $592 | $758 | $970 | $1,222 | $1,479 | $1,716 | $1,922 | $2,057 |
| Growth Rate | 25% | 25% | 26% | 28% | 28% | 26% | 21% | 16% | 12% | 7% |
| Revenue Difference (Millions) | $34 | $57 | $72 | $93 | $120 | $152 | $188 | $214 | $242 | $252 |
| Revenue Difference (Percentage) | 10.0% | 13.8% | 13.8% | 14.0% | 14.1% | 14.2% | 14.6% | 14.2% | 14.4% | 14.0% |

74.    Because Defendants elected to prepare the Projections utilizing a revenue growth

percentage for 2024 that they knew was wholly unreasonable and inaccurately reflected Sumo Logic's financial prospects, the following statements in the Proxy were materially false or misleading.

75. *First*, the Proxy at page 59 falsely stated: "In preparing and approving the Projections, Sumo Logic management utilized the following material assumptions. Sumo Logic management using its business judgement, **believed in good faith that these assumptions were reasonable: A decline in revenue growth to 14% in fiscal year 2024** before reaccelerating to 21 percent and 26 percent in fiscal years 2025 and 2026, respectively." As indicated by their knowledge, expectations, and statements regarding Sumo Logic's revenues, financial performance, and prospects, Defendants Sayar and Grierson did not actually believe in good faith that assuming a decline in revenue growth to 14% for fiscal year 2024 was reasonable. Rather, Defendants knew that assumption—which significantly reduced the Projections and made Sumo Logic look less value than it actually is—was unreasonable.

76. *Second,* and similarly, the Proxy at page 57 falsely conveyed that the Projections were not inaccurate or misleading and that they were "reasonably prepared and/or approved based on the best currently available estimates and judgments of Sumo Logic management of the future financial performance of Sumo Logic." Specifically, page 57 of the Proxy states: "The Projections were prepared and/or approved by, and are the sole responsibility of, Sumo Logic management. At Sumo Logic's direction, Morgan Stanley relied on the accuracy and completeness of the Projections utilized in its financial analyses and its advice to the Sumo Logic Board, as well as the assurances of Sumo Logic management that (1) it was not aware of any facts or circumstances that would make such information inaccurate or misleading; and (2) the Projections were reasonably prepared and/or approved based on the best currently available estimates and judgments of Sumo Logic management of the future financial performance of Sumo Logic." Once again, Defendants Sayar and Grierson knew that the Projections were *not* reasonably prepared and did *not* reflect their best estimates and judgments of the Company's future financial performance. Indeed, they knew that assuming a decline in revenue growth to 14% for fiscal year 2024 was entirely *unreasonable* and that the Projections did *not* reflect their

genuine best estimates of the Company's future financial performance.

77.    *Third*, the Projections themselves, set forth on page 59 of the Proxy, are materially false and misleading because they contain revenue projections that Defendants knew were unreasonably low and did not accurately or reasonably reflect the Company's financial prospects.

The following table presents a summary of the Projections. This table corrects for the additional add-back of amortization of intangible assets for fiscal years 2024 through 2027 that is further described in the section of this proxy statement captioned "—Background of the Merger."

| (dollars in millions) | January 2023 long-range plan unaudited financial information | | | | Extrapolations | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal year ended January 31, | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E |
| Revenue | $342 | $413 | $520 | $665 | $850 | $1,070 | $1,291 | $1,502 | $1,680 | $1,805 |
| EBIT[1] | ($34) | ($4) | $38 | $81 | $136 | $196 | $266 | $344 | $423 | $496 |
| Depreciation | $2 | $2 | $0 | $0 | $4 | $4 | $4 | $3 | $2 | $0 |
| EBITDA (Unburdened by Stock-Based Compensation)[2] | ($32) | ($2) | $39 | $81 | $140 | $200 | $270 | $347 | $425 | $496 |
| Stock-Based Compensation[3] | ($79) | ($87) | ($95) | ($86) | ($101) | ($115) | ($125) | ($130) | ($127) | ($117) |
| Taxes | ($2) | ($2) | ($3) | ($3) | ($12) | ($24) | ($39) | ($58) | ($80) | ($101) |
| Capital Expenditures | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | ($0) | $0 |
| Change in Net Working Capital | $16 | $32 | $21 | $13 | $17 | $20 | $20 | $19 | $16 | $11 |
| Unlevered Free Cash Flow (Burdened by Stock-Based Compensation)[4] | ($98) | ($60) | ($39) | $5 | $44 | $80 | $125 | $177 | $234 | $289 |

78.    The Projections were also misleading because they failed to take into account Sumo Logic's practice of expanding its customer base and developing its technology through acquisitions of smaller companies as part of its standalone business strategy. As noted above, in the years prior to the acquisition, Sumo Logic acquired one company per year on average, only holding off on acquisitions during 2020 – the height of Covid lockdowns and the year of the Company's IPO.

79.    In 2018, Sumo Logic acquired the IT threat investigation business Factor Chain to "accelerate[] the development of a new class of converged IT … security solutions". In 2019, the Company acquired the cybersecurity operations center software company JASK to "broaden[] Sumo Logic's portfolio [and] rich joint ecosystem of customers . . . while accelerating the companies' mutual strategy to deliver" an automated security operations center service. And in 2021, Sumo Logic acquired two companies – DF Labs and Sensu – making up for its pause in 2020. According to Sumo Logic, the acquisition of DF Labs helped develop the Company's security intelligence

AMENDED CLASS ACTION COMPLAINT

offerings and expand the Company's "ecosystem of customers". Likewise, the Sensu acquisition "accelerate[d] Sumo Logic's observability strategy by providing customers with an affordable, extensible, and scalable end-to-end solution for infrastructure and application monitoring."

80.    Because customer base expansion and technological development were fundamental drivers of Sumo's revenue base and growth rate, the Projections once again failed to accurately describe the Company's financial prospects and did not represent management's genuine best estimates of the Company's financial prospects.

81.    Defendant Sayar has publicly acknowledged the importance of revenue projections to investors in public companies, stating as follows in an interview with an industry commentator:[4]

> "Public markets don't get exposed to the [same metrics as private companies]. They're worried more about revenue and billings and op[erating] loss, and so there's this transition that you have to go through as a leadership team of the company in terms of what you're internally communicating and measuring versus what is going to be assumed and expected externally when you go public."

82.    Despite understanding the importance of revenue projections to investors, Defendants provided revenue estimates for the Company that they knew were unreasonable and failed to reflect Sumo Logic's genuine prospects.

83.    *Fourth*, the Proxy misleadingly and omissively stated that "[o]n December 5, 2022, Sumo Logic announced earnings for the third quarter of its 2023 fiscal year" without disclosing that the Company had outperformed its guidance for that quarter. Proxy at 37. In contrast, the Proxy's description of the Company's announcement for Q2 2023 noted that the Company had exceeded guidance. This was a material omission because it downplayed the fact that the Company was exceeding expectations at the time – a key consideration for investors evaluating whether to sell.

| Q3 Guidance | Q3 Result | % Beat |
|---|---|---|
| $73.5-74.5 million revenue | $79 million revenue | 6.76% |
| Non-GAAP operating margin of (24)% to (23)% | Non-GAAP operating margin of (7)% | 70.21% |
| Non-GAAP net loss per share of $0.15 | Non-GAAP net loss per share of $0.04 per share | 73.33% |

---

[4] *See*, Clari CEO Andy Byrne Interviews Sumo Logic CEO Ramin Sayar, Youtube (2:20-2:40) (uploaded May 12, 2021) (https://www.youtube.com/watch?v=1YzdvKbYsU8)

84.     *Fifth*, the Proxy misleadingly and omissively depicted Sumo Logic's results in Q4 2023 as "below the company's internal forecast" and cited this putative fact as a reason for the Merger without disclosing that the Company's performance in Q4 had in reality **beat** the Company's stated expectations for the quarter:

> Sumo Logic's financial results for the fourth quarter of its 2023 fiscal year, which were below the company's internal forecast and analyst's estimates of Sumo Logic's financial performance on new annual recurring revenue for that period.

85.     Proxy at 46.

86.     In Sumo Logic's earnings announcement for Q3 2023, the Company stated that it expected to achieve total revenue of between $77-78 million, a non-GAAP operating margin of (14)-(13)%, and non-GAAP net losses per share of $0.09-$0.08 in Q4 2023.

87.     In Q4 2023, the Company's revenue was $79.8 million, its non-GAAP operating margin was (5)%, and it had non-GAAP net losses per share of $0.03. All of these achieved metrics thus surpassed the Company's guidance for Q4 2023.

| Q4 Guidance | Q4 Result | % Beat |
|---|---|---|
| $77-78 million revenue | $79.8 million revenue | 2.97% |
| Non-GAAP operating margin of (14)-(13)% | Non-GAAP operating margin of (5)% | 62.96% |
| Non-GAAP net losses per share of $0.09-$0.08 | Non-GAAP net losses per share of $0.03 | 64.71% |

88.     *Sixth*, the implied value per share ranges of Sumo Logic Common Stock under a Public Trading Comparables Analysis and Discounted Equity Value Analysis, set forth on pages 51 and 52 of the Proxy, are materially false or misleading, because they were derived utilizing the unreasonably low revenue projections and thus presented a misleadingly low value for shareholders' shares:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### *Public Trading Comparables Analysis*

| Forecast Scenario | Implied Value per Share Range of Sumo Logic Common Stock ($) |
|---|---|
| street case | 5.91 – 11.15 |
| Projections | 10.47 – 15.31 |

### *Discounted Equity Value Analysis*

| Public Trading Multiples | Implied Value per Share Range of Sumo Logic Common Stock ($) |
|---|---|
| **AV / CY2023E Revenue** | |
| street case | 7.26 – 13.12 |
| Projections | 7.18 – 12.94 |
| **AV / CY2024E Revenue** | |
| street case | 7.91 – 13.24 |
| Projections | 8.13 – 13.70 |

89.     The key input in both the Public Trading Comparables Analysis and Discounted Equity Value Analysis was Sumo Logic's projected revenues. Thus, the implied value per share ranges were significantly lowered as a result of the unreasonably low, false and misleading revenue metrics set forth in the Projections.

90.     Moreover, none of the Proxy's so-called "cautionary language" warned that Defendants *did not actually believe* in good faith that the assumptions utilized to prepare the Projections were reasonable.

91.     As Sumo Logic's chief executive officer and chief financial officer, Defendants Sayar and Grierson were directly involved in making and/or approving each of the challenged statements, which relate to the Projections that they prepared or to their purported beliefs regarding the Projections.

92.     These misrepresentations in the Proxy were material to shareholders because they

AMENDED CLASS ACTION COMPLAINT

directly relate to the value of Sumo Logic shares, the fairness of the Merger Consideration, and management's views regarding the reasonableness of the Projections.

### III.    Loss Causation - Sumo Logic Shareholders Suffered Loss as a Result of the False and Misleading Statements in the Proxy

93.    The Proxy caused Sumo Logic's stockholders economic loss by inducing them to accept a sale that underpriced their shares. Moreover, since the acquisition could not have occurred without the approval of Sumo Logic shareholders, the Proxy was an essential link in the accomplishment of the Merger and the misleading statements were the cause of the Class's economic loss.

94.    If Sumo Logic shareholders had not been deceived by the above-referenced materially false and misleading statements and had been accurately informed of Sumo Logic's true value at the time of the acquisition, the Company stockholders would not have voted to approve the Merger at the $12.05 price offered by Francisco Partners, which would have caused Francisco Partners to increase its offer, allowed one of the other interested suitors to make a superior offer, or enabled the stockholders to keep their shares in a Company whose value was greater than the price paid in the Merger. Under any scenario, shareholders would have obtained or maintained greater value than the price they received for their shares.

95.    Indeed, Defendants' conduct caused Sumo Logic shareholders to lose out on alternative options that offered greater value, including the $13.00 expression of interest conveyed by Sponsor A or continuing with the Company's stand-alone plan. Sponsor A was unable to proceed with its $13.00 per share expression of interest because it was initially ignored or rebuffed, and Defendants and the Board then raced to finalize the Merger with Francisco Partners rather than providing Sponsor A with a reasonable amount of time to finalize its diligence and proceed with its offer.

96.    Moreover, Defendants failed to pursue another potentially more valuable alternative by rejecting the overture from Financial A, which was interested in making a minority investment in Sumo Logic and thus would have allowed stockholders to maintain their equity in the Company.

97.    Additionally, the Company's stand-alone plan offered shareholders greater value than the Merger Consideration. Indeed, one equity research analyst (Blair Abernethy of Rosenblatt Securities) had a price target for Sumo Logic of $18.00 per share as of January 20, 2023, and analyst Matthew Hedberg of RBC Capital Markets assigned the Company a price target of $12.00 per share (as published by Bloomberg on December 6, 2022) based on the "strength of the Company's platform" and "clean" execution. Neither of these targets would have included a control premium, the price paid by a buyer for the value of gaining control over a company's operations.

98.    Further, Morgan Stanley analyst Sanjit Singh described the Company's revenue and operating margins as impressive, and Jefferies analyst Brent Thrill described the Company's topline performance as "particularly strong."

99.    Furthermore, according to a discounted cash flow analysis performed by analysts from Simply Wall Street on February 24, 2023, Sumo Logic had an estimated fair value of $18.34. The analyst indicated that Sumo Logic was undervalued by the market by 35%.

100.    Moreover, shareholders' shares were worth $18.98 based on Wall Street analysts' projections, and $15.31 based on management's Projections. Thus, shareholders suffered financial loss when they had their shares cashed out for the Merger Consideration of just $12.05 per share.

101.    Lastly, as a result of the materially false and misleading Proxy, Sumo Logic shareholders were deceived into foregoing their appraisal rights under Delaware law.  If the Proxy had not deceived shareholders regarding the Company's fair value and the reasonableness of the Projections, a sufficient number of shareholders would have elected to exercise their appraisal rights under Delaware law, and would have received more than the $12.05 Merger Consideration in an appraisal, as the Company's fair value exceeded the Merger Consideration.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all other similarly situated former public stockholders of Sumo Logic who were harmed by Defendants' actions alleged herein (the "Class"). Excluded from the Class are: (i)

Defendants and members of their immediate families; (ii) the officers and directors of the Company and members of their immediate families; and (iii) any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

103.    This action is properly maintainable as a class action because:

(a)    The Class is so numerous that joinder of all members is impracticable. As of the April 3, 2023 record date to vote on the Merger, there were 124,088,187 shares of Sumo Logic common stock outstanding and entitled to vote, held by hundreds to thousands of individuals and entities dispersed throughout the country. The actual number of former public stockholders of Sumo Logic will be ascertained through discovery;

(b)    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including: (i) whether Defendants misrepresented material information in the Proxy in violation of Section 14(a) of the Exchange Act; (ii) whether the Defendants violated Section 20(a) of the Exchange Act; and (iii) whether the Class suffered damages.

(c)    Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

(e)    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and

efficiently adjudicating the controversy.

**CLAIMS FOR RELIEF**

**COUNT I**

**Against All Defendants**

**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

104.    Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

105.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

106.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

107.    Defendants caused the Proxy containing the above-referenced materially false, misleading, or omissive statements to be disseminated to Sumo Logic's shareholders, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

108.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy.

109.    Yet, as specified above, in violation of Section 14(a) of the Exchange Act and

Rule 14a-9, Defendants knowingly made untrue, misleading, or omissive statements of material fact in the Proxy, in order to induce Sumo Logic stockholders to vote in favor of the Merger.

110. The misrepresentations in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Sumo Logic Stockholder would have considered them important in deciding whether or not to vote in favor of the Merger.

111. Since Sumo Logic could not consummate the Merger unless the proposal to adopt the Merger Agreement was approved by the affirmative vote of the holders of a majority of the shares of Sumo Logic common stock issued and outstanding, the Proxy soliciting the votes of Sumo Logic stockholders was an essential link in the accomplishment of the Merger.

112. As a direct and proximate result of the dissemination of the materially false and misleading Proxy that the Defendants used to obtain shareholder approval of the Merger, Plaintiffs and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Acquisition) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## <u>COUNT II</u>

**Against Sayar and Grierson for**

**Violations of Section 20(a) of the Exchange Act**

113. Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

114. Sayar and Grierson acted as controlling persons of Sumo Logic within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of Sumo Logic, and participation in, and/or awareness of Sumo Logic's financial performance, prospects, and operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sumo Logic with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially

false and misleading.

115.    Sayar and Grierson were provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    Sayar and Grierson had direct and supervisory involvement in the negotiation of the Merger and the preparation of the Projections, and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, Sayar and Grierson were directly involved in preparing the false and misleading Projections and the Proxy sets forth their purported opinions regarding the Projections. Moreover, the Proxy was signed by Sayar. Sayar and Grierson were thus directly involved in the making of the statements challenged herein.

117.    In addition as described herein, Sayar and Grierson were involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that Sayar and Grierson reviewed and considered in connection with such negotiation, review and/or approval.

118.    By virtue of the foregoing, Sayar and Grierson had the ability to exercise control over and did control persons whom or an entity which violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, Sayar and Grierson are liable pursuant to Section 20(a) of the Exchange Act.

119.    As a direct and proximate result of the conduct of Sayar and Grierson and the misleading Proxy that the Defendants used to obtain shareholder approval of the Merger, Plaintiffs and the Class have suffered damages and actual economic losses (*i.e*., the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Sayar and Grierson are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Awarding Plaintiffs and the Class all damages sustained as a result of Defendants' wrongdoing, including, but not limited to, compensatory and/or rescissory damages.

C.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest on any damages award.

D.      Granting Plaintiffs and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and expenses;

E.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued upon hereunder; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.


Dated: November 20, 2023                    Respectfully submitted,

**OF COUNSEL**                                    */s/ David E. Bower*
                                                          David E. Bower

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde                            David E. Bower (SBN 119546)
Miles D. Schreiner                              **MONTEVERDE & ASSOCIATES PC**
Jonathan T. Lerner                              600 Corporate Pointe, Suite 1170
The Empire State Building                    Culver City, CA 90230
350 Fifth Avenue, Suite 4740              Tel: (213) 446-6652
New York, NY 10118                          Fax: (212) 202-7880
Tel: (212) 971-1341                            dbower@monteverdelaw.com
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com      *Counsel for Co-Lead Plaintiffs and Co-*
mschreiner@monteverdelaw.com        *Lead Counsel for the Putative Class*
jlerner@monteverdelaw.com

*Counsel for Co-Lead Plaintiffs and*
*Co-Lead Counsel for the Putative*
*Class*

AMENDED CLASS ACTION COMPLAINT

1  **KAHN SWICK & FOTI LLC**
   Michael J. Palestina
2  1100 Poydras Street, Suite 960
   New Orleans, LA 70163
3  Tel: (504) 455-1400
   Fax: (504) 455-1498
4  michael.palestina@ksfcounsel.com
5
   *Counsel for Co-Lead Plaintiffs and*
6  *Co-Lead Counsel for the Putative*
   *Class*
7
8  **WOHL & FRUCHTER LLP**
   Joshua E. Fruchter
9  25 Robert Pitt Drive, Suite 209G
   Monsey, NY  10952
10 Tel: (845) 290-6818
   jfruchter@wohlfruchter.com
11
   *Additional Counsel for Lead Plaintiff*
12 *Ranjit Kapil*
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED CLASS ACTION COMPLAINT