Juan E. Monteverde (NY Reg. # 4467882) (admitted *pro hac vice*)
MONTEVERDE & ASSOCIATES PC
350 Fifth Avenue, Suite 4740
New York, NY 10118
Tel: (212) 971-1341
jmonteverde@monteverdelaw.com

David E. Bower (SBN 119546)
MONTEVERDE & ASSOCIATES PC
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652

*Counsel for Co-Lead Plaintiffs and*
*Co-Lead Counsel for the Putative Class*

[additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| ARMIN WASICEK, DEVENDRA MODIUM, and RANJIT KAPIL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUMO LOGIC, INC. and RAMIN SAYAR,<br><br>Defendants. | Civil Action No. 5:23-cv-3665-BLF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED**<br><br>HON. BETH L. FREEMAN |

Co-Lead Plaintiffs Armin Wasicek, Devendra Modium, and Ranjit Kapil ("Plaintiffs"), on behalf of themselves and the putative Class defined below, by their undersigned attorneys, allege as follows based upon personal knowledge with respect to their own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings and other publicly available information.

## NATURE OF THE ACTION

1.     Plaintiffs bring this putative class action against Sumo Logic, Inc. ("Sumo" or the "Company") and its former chief executive officer Ramin Sayar ("Sayar", and, together with Sumo, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and SEC Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.     Plaintiffs' claims arise in connection with the solicitation of public stockholders of Sumo by Defendant Sayar and other members of Sumo's board of directors ("Sumo Board") to vote in favor of a merger transaction ("Merger") pursuant to which Sumo merged into an affiliate of Francisco Partners Management, L.P. ("Francisco Partners"), in exchange for $12.05 per share in cash ("Merger Consideration").

3.     On February 9, 2023, Sumo announced that the Sumo Board had approved the sale of the Company to Francisco Partners, pursuant to a merger agreement ("Merger Agreement") signed by Sayar on behalf of Sumo in his capacity as President and Chief Executive Officer ("CEO"). Under Section 6.3(g) of the Merger Agreement signed by Sayar, Sumo had a contractual obligation not to file a proxy "omit[ting] to state any material fact required to be stated therein or necessary in order to make the statements therein [regarding the Q3 2023 and Q4 2023 results], in light of the circumstances under which they are made, not false or misleading."

4.     Nevertheless, on April 5, 2023, in his capacity as President and CEO of Sumo, Sayar signed a materially false and misleading definitive proxy statement on Schedule 14A ("Proxy") that Sumo filed with the SEC and disseminated to Sumo stockholders.

5.     As further specified below (and summarized in the chart annexed hereto as Exhibit A in compliance with the final paragraph of the Court's August 5, 2024 order ("August 4 Order"), Dkt. No. 41 at 37), Defendants violated Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 by filing a Proxy that omitted material facts that rendered statements in the Proxy concerning Sumo's performance in the third quarter of 2023 ("Q3 2023"), and fourth quarter of 2023 ("Q4 2023"), materially false and misleading.

6.       As discussed further below, before signing the Proxy and authorizing its dissemination to Sumo shareholders, Sayar had a duty under the federal securities laws, the Merger Agreement, and Sumo's 2022 Code of Business Conduct and Ethics, to carefully read and review the Proxy before signing it, and ensure that it fully disclosed all material facts relevant to the voting decision of Sumo shareholders, especially with respect to material facts concerning Q3 2023 and Q4 2023 results about which Sayar had personal knowledge. Indeed, above his signature in the Proxy, Sayar instructed shareholders to "***[p]lease read the proxy statement and its annexes, including the merger agreement, carefully and in their entirety, as they contain important information***." As such, Sayar is liable for his failure to exercise reasonable care in fulfilling his duty to carefully read and review the Proxy, and correct material omissions in the Proxy concerning the Q3 2023 and Q4 2023 results about which he had personal knowledge. The Company is also liable for Sayar's failure to exercise such reasonable care.

7.       The special meeting of Sumo stockholders to vote on the Merger was held on May 10, 2023. At the meeting, 84,039,824 of the 124,088,187 outstanding shares of Sumo common stock voted to approve the Merger. Those votes were uninformed since, as a result of the materially false and misleading omissions in the Proxy, the shareholders who cast those votes were misled into concluding that Sumo's financial performance on three key metrics—total revenue, non-GAAP operating margin, and non-GAAP net loss per share—had substantially deteriorated in Q3 2023 and Q4 2023. In fact, as Sayar well knew from his participation in the preparation of press releases announcing quarterly results, and his own prior statements on quarterly conference calls, Sumo's performance on those three key metrics in Q3 2023 and Q4 2023 had exceeded prior guidance (including by over 60% on two of those metrics). Thus, Sumo's performance had not deteriorated in Q3 2023 and Q4 2023 as Sumo stockholders were misled to believe, but exceeded expectations.

8.       Had the Proxy not omitted the material facts about Q3 2023 and Q4 2023 results specified below, and instead been truthful and disclosed that Sumo's financial performance had, in fact, exceeded guidance in those quarters on three key metrics, Sumo shareholders would have had a very different impression of Sumo's financial performance and future prospects when they

voted, and not have voted to approve the Merger at an unfair price. Instead, the Proxy primed Sumo stockholders to accept an unfair price by creating the materially false and misleading impression that Sumo's future prospects had deteriorated in Q3 2023 and Q4 2023.

9.     Following the uninformed vote of Sumo shareholders in favor of the Merger, the Merger closed on May 12, 2023. After the Merger closed, Defendant Sayar walked away with ***$42.9 million in cash*** (as compared to compensation in 2022 consisting of a cash salary of just $362,250, a cash bonus of just $350,205, and Restricted Stock Units ("RSUs") valued at $5.35 million on the grant date that nearly all (98%) vested quarterly over four years).

10.    Plaintiffs seek to recover damages they and other similarly situated former Sumo stockholders suffered as a result of Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

12.    Personal jurisdiction exists over each Defendant. This Court has jurisdiction over Sumo because it maintains its principal executive offices in Redwood City, California, which is within this District. This Court has jurisdiction over Sayar because he conducted business in this state by serving as an officer and director of Sumo, which was managed in this District. Moreover, "[w]here a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

13.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Sumo maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District;

and (iv) Defendants have received substantial income in this District by doing business here and engaging in numerous activities that had an effect in this District.

**PARTIES**

14.　　Plaintiffs were, at all relevant times, holders of Sumo common stock.

15.　　Defendant Sumo is a Delaware corporation with its principal executive offices located at 855 Main Street, Suite 100, Redwood City, California 94063. Before the Merger, Sumo's common stock was listed on the Nasdaq Global Select Market under the ticker "SUMO." Sumo survived the Merger as a wholly owned subsidiary of Serrano Parent, LLC, an affiliate of Francisco Partners.

16.　　Defendant Ramin Sayar ("Sayar") served as Sumo's CEO and as a member of the Board at all relevant times.

**SUBSTANTIVE ALLEGATIONS**

**I.　　Defendants and the Board Sell Sumo to Francisco Partners at an Inadequate and Unfair Price**

***Sumo's Business***

17.　　Sumo provides cloud-based software-as-a-service solutions that enable organizations to, among other things, ensure the reliability and security of cloud applications and workloads, including detecting security threats, automating security responses to remediate threats, and performing security analysis and forensics. The Company completed four acquisitions of smaller cybersecurity companies from 2018 to 2021, averaging one acquisition per year. Sumo used these acquisitions to develop its technology and expand its customer and revenue base.[1]

18.　　In September 2020, Sumo completed its initial public offering at a price of $22.00 per share. Thus, the sales price in the Merger represents an approximately 45% decline from the IPO price less than three years later. Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter in Sumo's initial public offering, and received fees of $5 to $10 million for

---

[1] The acquired companies were Factor Chain (acquired 2018), JASK (acquired 2019), DF Labs (acquired 2021), and Sensu (acquired 2021).

services it provided to Sumo during the two-and-a-half-year period preceding the Merger.

19.    As discussed further below, Sumo began generating strong financial results during its 2023 fiscal year, and had strong prospects for future growth as a stand-alone entity.

*Francisco Partners Expresses Interest in Acquiring Sumo*

20.    On June 3, 2022, representatives of Francisco Partners contacted Sumo director Charles Robel ("Robel") to request a meeting. Thereafter, on June 6, 2022, Francisco Partners provided Sumo with a proposal to acquire Sumo for $11.00 in cash per share.

21.    On June 8, 2022, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini Goodrich & Rosati, Sumo's outside legal advisor ("Wilson Sonsini"). At the meeting, Sayar reviewed Francisco Partners' June 3 proposal. The Sumo Board initially determined that the June 3 proposal was credible and merited further consideration.

22.    Following the June 8 Board meeting, the Sumo Board and the Audit Committee of the Board met multiple times with its advisors to review Francisco Partners' June 3 proposal. At the end of that review process, the Sumo Board concluded that Francisco Partners' June 3 proposal "was not at a compelling valuation."

23.    On July 12, 2022, Robel met with Francisco Partners. At that meeting, Robel advised Francisco Partners that a meeting with Sumo management was not warranted at that time because the June 3 proposal was not at a compelling valuation, and the Sumo Board believed in the strength of Sumo's prospects as an independent public company.

*Sumo Announces Strong Q2 2023 Results That Beat Guidance*

24.    On August 25, 2022, Sumo announced strong results for the second quarter of its 2023 fiscal year. Sumo exceeded the guidance that it had previously provided to the market for Q2 2023 on three key metrics: total revenue, non-GAAP operating margin, and non-GAAP net loss per share.

25.    The press release ("Q2 2023 Release") announcing the Q2 2023 results quoted Sayar:

> "We continued to deliver improved revenue growth in the second quarter with year-over-year growth of 26% while also driving better operating efficiencies," said Ramin Sayar, President and CEO of Sumo Logic. "We remain positive on the

long term trends driving our business as companies continue to focus on delivering reliable and secure mission critical cloud applications for their customers."

26.     The Q2 2023 Release also provided the following guidance with respect to Q3 2023 on the above three key metrics: (i) total revenue between $73.5 million and $74.5 million, representing 19% to 20% growth year-over-year; (ii) Non-GAAP operating margin of (24)% to (23)%; and (iii) Non-GAAP net loss per share of $0.15 on approximately 119.0 million weighted average shares outstanding.

27.     On August 25, 2022, Sumo filed a Form 8-K concerning its Q2 2023 results with the Q2 2023 Release attached as an Exhibit. The Form 8-K provided that the Q2 2023 Release shall not be incorporated by reference into any future filing under the Exchange Act (which would include proxies filed under Section 14(a) of the Exchange Act), unless expressly incorporated by specific reference:

> On August 25, 2022, Sumo Logic, Inc. issued a press release announcing its financial results for its second quarter ended July 31, 2022. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated herein by reference.
>
> The information contained in Item 2.02 of this current report on Form 8-K and in Exhibit 99.1 attached hereto are "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the ""Exchange Act"), or otherwise subject to the liabilities of that section, and shall not be incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act regardless of any general incorporation language in such filing, unless expressly incorporated by specific reference in such filing.[2]

28.     On August 25, 2022, Sumo conducted an earnings call ("Q2 2023 Call") during which Defendant Sayar and Sumo's Chief Financial Officer ("CFO"), Stewart Grierson, discussed Sumo's Q2 2023 results and guidance for Q3 2023 with Wall Street analysts. In his prepared remarks, Sayar stated:

> ***We are pleased with the continued strength in our business as we, once again, <u>exceeded our revenue guidance</u> while also delivering more efficient growth***. In Q2 we delivered 26% year-over-year revenue growth and 25% year-over-year ARR growth. We complimented this strong top line growth with continued focus

---

[2] All emphasis in quotations is added unless otherwise noted.

on managing our expenses and thereby delivering better than expected operating losses as a percentage of revenue in the quarter.

29.     Grierson later discussed Q2 2023 results and provided guidance for Q3 2023 while Sayar listened in:

> As a reminder and unless otherwise noted, all metrics are non-GAAP . . . As previously stated, total Q2 revenue increased to $74.1 million up 26% year-over-year. As stated previously, our Q2 operating margin was negative 17%, ***which was significantly better than guidance***. Net loss in the quarter was $12 million or negative $0.10 per diluted share based on approximately $116.6 million weighted average diluted shares outstanding . . . ***Turning to guidance . . . For the third quarter***, ***we expect total revenue of $73.5 million to $74.5 million*** representing 19% to 20% year-over-year growth. ***Non-GAAP operating margin of negative 24% to negative 23%***, and ***non-GAAP loss per share of negative $0.15*** on approximately 119 million weighted average shares outstanding.

***Sumo Reports Strong Performance and Guidance at its Investor Day***

30.     On September 20, 2022, Sumo held its investor day, during which Sayar and Grierson, along with other members of Sumo's management team, optimistically explained Sumo's business and financial plan, path to profitability and strategic vision. Sumo's investor day presentation included the following slides, evidencing Sayar's attendance, and referencing the Company's historical financial performance and fiscal year 2023 guidance:

SECOND AMENDED CLASS ACTION COMPLAINT, Case No. 5:23-cv-3665-BLF







SECOND AMENDED CLASS ACTION COMPLAINT, Case No. 5:23-cv-3665-BLF

31.   During the investor day call with Sayar in attendance, CFO Grierson stated:

Let's talk about our revenue model. So most of our revenue is subscription in nature with our contracts typically being 1 to 3 years in duration. We're not a consumption model.[3] There's been some confusion about this in the market, but we're not a consumption model. We recognize revenue ratably over the term of the contract. ***This gives us really strong forward visibility and predictability around our revenue.***

32.   CFO Grierson also stated: "[W]e've significantly improved the operating margin guidance we gave at the beginning of the year, ***which was negative 26.5%. And at the end of Q2, our updated guidance was negative 23% to negative 22%.***"

33.   Sayar was thus well aware of Sumo's actual results and guidance, and would have known when actual results exceeded guidance. As set forth below, while Sumo's actual results continued to exceed management's guidance for the rest of fiscal year 2023, the Proxy signed by Sayar created the materially false and misleading impression that Sumo's performance had deteriorated in Q3 and Q4 2023.

**Despite Strong Results, the Sumo Board Decides to Pursue a Sale**

34.   On October 3, 2022, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini. At that meeting, the Sumo Board determined to explore the possible retention of an investment bank to provide financial advice in conjunction with any third party offers to acquire the Company. Additionally, despite having determined in July 2022 that Francisco Partners' offer did not merit a meeting with management, and despite Sumo subsequently reporting strong Q2 2023 results, the Sumo Board reversed course and instructed Messrs. Robel and Sayar to meet with representatives of Francisco Partners.

35.   In the days following the October 3, 2022 Board meeting, Sumo contacted Morgan Stanley, which was later formally retained to act as the Company's financial advisor via an engagement letters signed on November 16, 2022.[4]

---

[3] A "consumption model" refers to a SaaS business model that features usage-based rather than subscription-based pricing.

[4] According on the Proxy, it was not until February 6, 2023—two days before Sumo entered into the Merger Agreement—that the Board first reviewed Morgan Stanley's relationship disclosures, which disclosed that Morgan Stanley had performed services for Francisco Partners during the

36.     On October 10, 2022, Sayar and Robel met with representatives of Francisco Partners. During the meeting, Francisco Partners expressed their continued interest in acquiring Sumo.

37.     On October 14, 2022, representatives of a potential financial sponsor acquiror, referred to as "Sponsor A", contacted CFO Grierson. Sponsor A expressed its admiration for Sumo, and stated that Sponsor A had accumulated a position in Sumo common stock through open market purchases. Sponsor A also expressed an interest in being included in any strategic review process.

38.     On November 2, 2022, Francisco Partners provided Sumo with a proposal to acquire Sumo for $11.50 in cash per share.

39.     On November 4, 2022, the Sumo Board met. Despite (i) coming off a strong financial quarter, (ii) conveying Sumo's strong stand-alone prospects to the market, and (iii) advising Francisco Partners just four months earlier that its $11.00 per share offer was "not a compelling valuation," and did not merit a meeting with Sumo management, Defendants and the Board did a sudden about face, and determined that Francisco Partners' November 2 proposal of $11.50 per share—a mere 4.5% increase—"was credible and had the potential to lead to a transaction *that would be attractive* to Sumo Logic and its stockholders." In anticipation of launching a review of Sumo's strategic alternatives, the Board delegated authority to its Corporate Governance and Nominating Committee ("Corporate Governance Committee") to oversee and assist Sumo's management and advisors with respect to exploring and negotiating strategic alternatives. According to Sumo's 2022 Annual Proxy, the Corporate Governance Committee was comprised of directors Robel, Sandra E. Bergeron, Tracey Newell, and William D. (BJ) Jenkins, Jr. with Robel serving as Chairperson.

40.     On November 15, 2022, the Corporate Governance Committee met with members

two years prior to Morgan Stanley's provision of a fairness opinion with respect to the Merger. The Proxy is vague about the precise amount of the fees previously paid by Francisco Partners to Morgan Stanley for its "financial advisory and financing services to Francisco Partners and certain of its majority-controlled affiliates," stating only that it was "less than approximately $1 million."

of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. After

reviewing a list of counterparties that might have an interest in pursuing an acquisition of Sumo

developed by Morgan Stanley, the Corporate Governance Committee determined that Sumo

should pursue a targeted, private process focused on the potential strategic and financial

acquirers most likely to have an interest in acquiring Sumo and the capability to finance and

consummate such an acquisition. The Corporate Governance Committee further agreed that, as a

first step in that process, representatives of Sumo should meet again with representatives of

Francisco Partners to discuss its November 2 proposal.

41.     On November 16, 2022, Sayar, Grierson, Robel and another Sumo director,

Randy S. Gottfried, met with representatives of Francisco Partners to discuss Francisco Partners'

November 3 proposal.

**Sumo Announces Strong Q3 2023 Results That Beat Guidance**

42.     On December 5, 2022, Sumo announced its third quarter fiscal 2023 financial

results. Sumo exceeded the guidance that it had previously provided to the market for Q3 2023

on the same three key metrics: total revenue, non-GAAP operating margin and non-GAAP net

loss per share.

43.     The press release ("Q3 2023 Release") announcing Q3 2023 results quoted Sayar:

"We delivered revenue growth of 27% year-over-year in the third quarter while
also driving better operating efficiencies, and will continue to emphasize efficient
growth as we drive towards future cash flow break even and profitability," ***said
Ramin Sayar, President and CEO of Sumo Logic***. "Our unified cloud-native
platform for reliability and security continues to resonate with our customers and
industry analysts as more customers are seeking to provide best in class digital
experiences to their end users."

44.     The Q3 2023 Release provided the following guidance concerning Q4 2023: (i)

total revenue between $77.0 million and $78.0 million, representing 15% to 16% growth year-

over-year; (ii) Non-GAAP operating margin of (14)% to (13)%; and (iii) Non-GAAP net loss per

share of $0.09 to $0.08 on approximately 120.5 million weighted average shares outstanding.

45.     On December 5, 2022, Sumo filed a Form 8-K concerning its Q3 2023 results

with the Q3 2023 Release attached as an Exhibit. The Form 8-K provided that the Q3 2023

Release shall not be incorporated by reference into any future filing under the Exchange Act (which would include proxies filed under Section 14(a) of the Exchange Act), unless expressly incorporated by specific reference:

> On December 5, 2022, Sumo Logic, Inc. issued a press release announcing its financial results for its third quarter ended October 31, 2022. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated herein by reference.

> The information contained in Item 2.02 of this current report on Form 8-K and in Exhibit 99.1 attached hereto are "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the ""Exchange Act"), or otherwise subject to the liabilities of that section, **_and shall not be incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act regardless of any general incorporation language in such filing, unless expressly incorporated by specific reference in such filing_**.

46.    On December 5, 2022, Sumo conducted an earnings call ("Q3 2023 Call") during which Defendant Sayar and CFO Grierson discussed Sumo's Q3 2023 results and guidance for Q4 2023 with Wall Street analysts. In his prepared remarks, Sayar stated:

> Thanks, everyone for joining us today on our third quarter earnings call. We are pleased with the continued progress and strength in our business. **_We once again exceeded the high end of all of our guided metrics. In Q3, we delivered total revenue of $79 million, or 27% year-over-year revenue growth_** and ended the quarter with ARR of $298.9 million, or 22% year-over-year growth. **_We achieved these strong results, while also demonstrating outperformance across both gross margin and operating margin_**.

47.    Grierson later discussed Q3 2023 results and provided guidance for Q4 2023 while Sayar listened in:

> Now, I'll review the income statement in more detail . . . As a reminder, unless otherwise noted, all metrics are non-GAAP . . . **_As previously stated, total Q3 revenue increased to $79 million, up 27% year-over-year_** . . . **_As stated previously, our Q3 operating margin was negative 7%_** driven by revenue outperformance, improvements in gross margin and careful management of operating expenses. **_Net loss in the quarter was negative $4.4 million or negative $0.04 per diluted share_** based on approximately 119.1 million weighted average diluted shares outstanding . . . Turning to guidance . . . For the fourth quarter, **_we expect total revenue of $77 million to $78 million_**, representing 15% to 16% year-over-year growth. **_Non-GAAP operating margin of negative 14% to_**

*negative 13%* and ***non-GAAP loss per share of negative $0.09 to negative $0.06***
(ph) on approximately 120.5 million weighted average shares outstanding.

48.     The extent to which Q3 2023 results exceeded prior guidance from the Q2 2023

Call concerning revenue, non-GAAP operating margin, and non-GAAP net loss per share is

illustrated by the following table:

| **Q3 2023 Guidance From Q2 2023 Call** | **Actual Q3 2023 Results** |
| --- | --- |
| **Revenue:** $73.5-$74.5 million | **Revenue:** $79 million (+6.76% beat) |
| **Non-GAAP Operating Margin:** Negative 23%-24% | **Non-GAAP Operating Margin:** Negative 7% (+70.21% beat) |
| **Non-GAAP Loss Per Share:** Loss of $0.15 per share | **Non-GAAP Loss Per Share:** Loss of $0.04/share (+73.33% beat) |

**Sumo Agrees to a Sale to Francisco Partners for an Unfair Price**

49.     On December 7, 2022, notwithstanding the strong Q3 2023 results, the Sumo

Board met with members of Sumo management and representatives of Wilson Sonsini and

Morgan Stanley to further discuss the broad contours of a strategic review process that could be

undertaken by Sumo, including a preliminary list of counterparties that might have an interest in

pursuing an acquisition of Sumo. The Sumo Board discussed the conversations held to date with

Sponsor A, Sponsor B and Sponsor C, and determined not to include Sponsor A, Sponsor B or

Sponsor C in the initial phase of the strategic review process, purportedly out of a belief that

these sponsors were unlikely to have the capability to finance and consummate an acquisition of

Sumo.

50.     Yet, on December 9, 2022—*just two days after* the Board's determination

concerning Sponsor A at the December 7 Board meeting attended by Sumo management—Sumo

management met with representatives of Sponsor A. During the meeting, Sponsor A spoke

generally about the possible benefits to Sumo of not being a public company, and although

Sponsor A did not make an offer, it expressed willingness to partner with Sumo if Sumo chose to

become a private company.

51.    On December 13, 2022, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The members of Sumo management described their expectations for Sumo's operating and financial results for fiscal years 2024 through 2026, as well as their recent meeting with representatives of Sponsor A.

52.    Thereafter, from December 14, 2022 through January 5, 2023, Sumo management, with representatives of Morgan Stanley in attendance, gave presentations concerning Sumo's business to the nine financial sponsor acquirors (including Francisco Partners) that had entered into confidentially agreements with Sumo. During this period, Francisco Partners and the six other financial sponsor acquirors considering an acquisition of Sumo (referred to as Sponsor D, Sponsor E, Sponsor F, Sponsor G, Sponsor H, and Sponsor I) were granted access to an electronic data room containing financial and business information with respect to Sumo to support their due diligence review of Sumo.

53.    On December 20, 2022, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. Morgan Stanley provided an update on the status of discussions with potential strategic and financial sponsor acquirors and the relative level of acquisition interest that each was then displaying. The Corporate Governance Committee discussed whether to include Sponsor A, Sponsor B or Sponsor C in the current phase of Sumo's strategic review process. Apparently, the Corporate Governance Committee did not share the full Board's skepticism regarding the ability of Sponsor A to finance and consummate an acquisition of Sumo. Instead, it was the consensus of the Corporate Governance Committee to pursue discussions with Sponsor A given Sponsor A's stated interest in participating in a strategic review process that Sumo might choose to undertake.

54.    On December 21, 2022, a representative of Sponsor A contacted Sayar to request a meeting with Sumo management. Later that day, and consistent with the decision of the Corporate Governance Committee, Morgan Stanley contacted Sponsor A to invite Sponsor A to participate in the strategic review process. Sponsor A responded that it would need additional time to consider whether to participate.

55.    On December 27, 2022, the Corporate Governance Committee met with members

of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The members of Sumo management reviewed with the Corporate Governance Committee a draft of Sumo's preliminary long-range operating plan prepared by Sumo management. The Corporate Governance Committee directed Sumo management to refine the plan based on their input.

56.    On January 3, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini. Sumo management reviewed with the Corporate Governance Committee a revised draft of Sumo's preliminary long-range operating plan.

57.    On January 6, 2023, Sumo management shared the preliminary long-range operating plan with the full Board. The full Sumo Board instructed Sumo management to further refine the preliminary long-range operating plan based on their input.

58.    On January 10, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The Corporate Governance Committee approved the distribution by Morgan Stanley of a bid process letter to those potential acquirors that were still considering an acquisition of Sumo, which would request that written acquisition proposals be submitted by January 24, 2023.

59.    On January 13, 2023, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The members of Sumo management reviewed the further revised draft of Sumo's long-range operating plan, which reflected the input received from the Sumo Board at its meeting on January 6, 2023. The Sumo Board approved providing this January 2023 long-range plan ("January 2023 Long-Range Plan") to Morgan Stanley for purposes of its financial analyses of Sumo and to potential acquirors. Notably, the January 2023 Long-Range Plan assumed a decline in revenue growth to only 14% in fiscal year 2024, even though Sumo had just reported a 27% increase in revenue in Q3 2023, and despite the optimistic outlook communicated at the September 2022 investor day.

60.    On January 16, 2023, representatives of a potential financing source ("Financial A") contacted Morgan Stanley concerning Financial A's interest in making a minority investment in Sumo. The representatives of Morgan Stanley responded that they would inform

the Sumo Board of the conversation. On January 17, 2023, the Corporate Governance Committee decided against engaging with Financial A.

61.     On January 17, 2023, Morgan Stanley distributed bid process letters to Francisco Partners and several other bidders, but not to Sponsor A even though the Corporate Governance Committee had determined on December 20, 2022, to pursue discussions with Sponsor A, and on December 21, 2022, Morgan Stanley had contacted Sponsor A to invite Sponsor A to participate in the strategic review process. While Sponsor A said it would need additional time to decide whether to participate, the Proxy does not explain why Morgan Stanley did not inform Sponsor A about the January 24, 2023 deadline to submit a written acquisition proposal, given Sponsor A's prior interest in the strategic review process.

62.     As it so happens, later on January 17, 2023, representatives of Sponsor A contacted representatives of Morgan Stanley and expressed Sponsor A's interest in acquiring Sumo, subject to securing additional financing commitments.

63.     On January 18, 2023, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The representatives of Morgan Stanley reviewed with the Sumo Board preliminary financial analyses of Sumo based on the January 2023 Long-Range Plan.

64.     On January 23, 2023, *The Information* published an article stating that private equity firms, including Francisco Partners, had approached Sumo regarding an acquisition. The article noted that private equity firms had recently been on a software-buying spree, "taking advantage of low valuations to expand" in the area.

65.     After *The Information* article was published, several additional potential counterparties reached out to Sumo to convey their interest in participating in the sales process. However, rather than seriously engaging with such other potential counterparties and affording them adequate time for due diligence, the Board raced to finalize a deal with Francisco Partners. Indeed, Sumo entered into the Merger Agreement with Francisco Partners just two weeks later.

66.     On January 24, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The Corporate

Governance Committee discussed, *inter alia*, the timing for the receipt of acquisition proposals from Francisco Partners and Sponsor D, which were expected within the next day. The Corporate Governance Committee also discussed the status of Sponsor A.

67.    Later on January 24, 2023, Francisco Partners submitted a proposal to acquire Sumo for $11.95 in cash per share. Francisco Partners conveyed its eagerness to sign and announce the transaction within a week.

68.    On January 25, 2023, Sponsor D submitted a non-binding proposal to acquire Sumo for $10.50 in cash per share.

69.    On January 26, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The Corporate Governance Committee conveyed a desire for a purchase price per share in the teens. The Corporate Governance Committee also instructed Morgan Stanley to inform the parties that had conveyed interest since *The Information* article was published that they would need to act on an accelerated timeline. The Corporate Governance Committee also determined not to engage further with Sponsor A at that time given, among other things, the purported belief of the Corporate Governance Committee that Sponsor A was unlikely to have the capability to finance and consummate an acquisition of Sumo. This new determination with respect to Sponsor A was inconsistent with the Corporate Governance Committee's prior interest in discussions with Sponsor A, and indicates that the Corporate Governance Committee was not serious about engaging with Sponsor A.

70.    On January 27, 2023, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. Morgan Stanley provided an update on the status of discussions with potential strategic and financial sponsor acquirors and the relative level of acquisition interest that each was then displaying. Morgan Stanley also reviewed the terms of the submitted proposals from a financial point of view. The members of the Corporate Governance Committee provided their recommendation on next steps to the full Sumo Board. The Sumo Board reviewed the results of the strategic review process, and, in the light of that process nearing a conclusion, discussed whether outreach to additional potential strategic or

financial sponsor acquirors was warranted. After discussion, the Sumo Board agreed with the recommendations of the Corporate Governance Committee with an important exception—after considering the remaining parties still engaged in discussions with Sumo, the Sumo Board was in favor of engaging with Sponsor A, and authorized Morgan Stanley to contact Sponsor A regarding its interest in pursuing an acquisition of Sumo on an accelerated basis.

71.     In the days following the Board's January 27, 2023 meeting, Sponsor A (i) continued to express what the Proxy refers to inaccurately without explanation as "preliminary" interest in pursuing acquisition discussions (given Sponsor A's previously expressed interest since October 2022), and (ii) expressed what the Proxy refers to pejoratively without explanation as a "theoretical" ability to offer a price of approximately $13.00 in cash per share (which is inconsistent with the Corporate Governance Committee's subsequent direction to provide a draft merger agreement to Sponsor A, the later execution of a confidentiality agreement with Sponsor A, and provision to Sponsor A of access to the data room).

72.     On January 31, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The Corporate Governance Committee authorized providing a draft merger agreement to Francisco Partners and Sponsor D, with instructions that such parties return a revised draft of the merger agreement with their acquisition proposals on or prior to February 3, 2023. In view of the interest expressed by Sponsor A, the Corporate Governance Committee also authorized providing Sponsor A with the draft merger agreement, but only if Sponsor A expressed an ability to pursue an acquisition of Sumo on an accelerated basis.

73.     Later on January 31, 2023, Sponsor A entered into a confidentiality agreement with Sumo. Sponsor A was given access to the data room containing financial and business information concerning Sumo. Sponsor A informed Morgan Stanley that it required 30 to 45 days to complete its due diligence.

74.     On February 2, 2023, representatives of Francisco Partners and Sponsor D met separately with members of Sumo management and representatives of Morgan Stanley to "discuss Sumo's anticipated business and financial results for the fourth quarter of its 2023 fiscal

year." Since Sayar was the most senior member of Sumo management, it is reasonable to infer that Sayar participated in these meetings concerning anticipated results for Q4 2023, and thus was aware that Sumo would beat guidance in Q4 2023 for three key metrics, as further discussed below.

75.    On February 3, 2023, Francisco Partners provided Sumo with a proposal to acquire Sumo for $12.00 in cash per share. The February proposal noted that Francisco Partners was prepared to sign a definitive merger agreement and announce an acquisition of Sumo within 48 hours.

76.    On February 5, 2023, the Corporate Governance Committee met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The representatives of Morgan Stanley reviewed the terms of Francisco Partners' February 3 proposal from a financial point of view. The Corporate Governance Committee discussed that Sponsor A had stated that it required 30 to 45 days to complete due diligence. The Corporate Governance Committee instructed Morgan Stanley to inform Francisco Partners that the Sumo Board was likely to be supportive of Francisco Partners' February 3 proposal but expected the acquisition price to (1) represent a premium to Sumo's closing stock price on the trading day prior to announcement of a transaction; and (2) be no less than $12.00 in cash per share of Sumo common stock. The Corporate Governance Committee also instructed Wilson Sonsini to negotiate the remaining terms of the merger agreement and the equity commitment letter with the goal of signing the merger agreement with Francisco Partners as soon as possible.

77.    On February 6, 2023, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. The decisions of the Corporate Governance Committee were reviewed, along with the terms of Francisco Partners' February 3 proposal (including the terms of the revised merger agreement and equity commitment letter provided by Francisco Partners). At that point, apparently for the first time according to the Proxy, the Sumo Board reviewed Morgan Stanley's relationship disclosures, which included disclosures regarding Morgan Stanley's prior work for Francisco Partners.

78.    On February 8, 2023, Morgan Stanley met with representatives of Francisco

Partners. Francisco Partners informed Morgan Stanley that Francisco Partners would not pay a premium to the closing price of Sumo common stock on February 8, 2023, and would instead only increase the value of its proposal to $12.05 in cash per share of Sumo common stock.

79.    Later on February 8, 2023, Defendants and the Board agreed to accept Francisco Partners' offer, despite Francisco Partners having rejected the Board's request to pay a premium to the closing price on the day before a transaction was announced. The Sumo Board instructed the representatives of Wilson Sonsini and Morgan Stanley to position Sumo to be able to sign the Merger Agreement before the start of trading on Nasdaq on February 9, 2023.

80.    On February 8, 2023, Sumo's stock closed at $12.18 per share.

81.    On February 9, 2023, the Sumo Board met with members of Sumo management and representatives of Wilson Sonsini and Morgan Stanley. Morgan Stanley reviewed Morgan Stanley's financial analyses of the final proposal based on the January 2023 Long-Range Plan and extrapolations thereto, and then rendered an opinion concerning the purported fairness of the sales price. The Proxy disclosed that Sumo had agreed to pay Morgan Stanley a fee of approximately $29.0 million for the fairness opinion and other services, $6.0 million of which was earned following delivery of the fairness opinion, and the remainder of which—nearly 80%—was contingent upon the consummation of the Merger, thus providing Morgan Stanley with a strong economic incentive to opine that the sales price was fair.

82.    Later on February 9, 2023, Sumo and Francisco Partners signed the Merger Agreement, and then publicly disclosed the sale.

83.    On February 9, 2023, Sumo's stock closed *down* at $11.90 per share, reflecting the failure of the sales price to meet the market's expectations (based on the close of $12.18 per share on February 8, 2023).

**Sumo Reports Strong Q4 2023 Results That Beat Prior Guidance**

84.    On March 7, 2023, Sumo announced its Q4 and full year fiscal 2023 financial results. Sumo exceeded the guidance for Q4 2023 that it had previously provided to the market on the same three key metrics: total revenue, non-GAAP operating margin and non-GAAP net

loss per share.

85.    The press release ("Q4 2023 Release") announcing Q4 2023 results shared the following highlights: (i) Revenue was $79.8 million, an increase of 19% year over year; (ii) Non-GAAP operating loss was $4.0 million; and (iii) non-GAAP operating margin was negative 5%.

86.    On March 7, 2023, Sumo filed a Form 8-K concerning its Q4 2023 results with the Q4 2023 Release attached as an Exhibit. The Form 8-K provided that the Q4 2023 Release shall not be incorporated by reference into any future filing under the Exchange Act (which would include proxies filed under Section 14(a) of the Exchange Act), unless expressly incorporated by specific reference:

> On March 7, 2023, Sumo Logic, Inc. issued a press release announcing its financial results for its fourth quarter ended January 31, 2023. A copy of the press release is furnished herewith as Exhibit 99.1 and is incorporated herein by reference.

> The information contained in Item 2.02 of this current report on Form 8-K and in Exhibit 99.1 attached hereto are "furnished" and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the ""Exchange Act"), or otherwise subject to the liabilities of that section, *and shall not be incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act regardless of any general incorporation language in such filing, unless expressly incorporated by specific reference in such filing*.

87.    The extent to which Q4 2023 results exceeded prior guidance from the Q3 2023 Call concerning revenue, non-GAAP operating margin, and non-GAAP net loss per share is illustrated by the following table:

| Q4 2023 Guidance From Q3 2023 Call | Actual Q4 2023 Results |
| --- | --- |
| **Revenue:** $77-$78 million | **Revenue:** $79.8 million (+2.97% beat) |
| **Non-GAAP Operating Margin:** Negative 13-14% | **Non-GAAP Operating Margin:** Negative 5% (+62.96% beat) |
| **Non-GAAP Loss Per Share:** Loss of $0.06 per share | **Non-GAAP Loss Per Share:** Loss of $0.03/share (+64.71% beat) |

**Sumo Files a False and Misleading Proxy**

88.     On April 5, 2023, Sumo filed the Proxy signed by Sayar. As further specified below (and summarized in the chart annexed hereto as Exhibit A), Defendants violated Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 by filing a Proxy with omissions of material fact that rendered statements in the Proxy regarding results in Q3 2023 and Q4 2023 materially false and misleading.

89.     Page 106 of the Proxy contained the following warning to Sumo shareholders concerning the universe of information upon which they should rely when deciding how to vote:

> ***YOU SHOULD RELY <u>ONLY</u> ON THE INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT IN VOTING YOUR SHARES OF SUMOLOGIC'S COMMON STOCK AT THE SPECIAL MEETING. WE HAVE <u>NOT</u> AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM WHAT IS CONTAINED IN THIS PROXY STATEMENT***. THIS PROXY STATEMENT IS DATED APRIL 5, 2023. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS PROXY STATEMENT IS ACCURATE AS OF ANY DATE OTHER THAN THAT DATE (OR AS OF AN EARLIER DATE IF SO INDICATED IN THIS PROXY STATEMENT), AND THE SENDING OF THIS PROXY STATEMENT TO STOCKHOLDERS DOES NOT CREATE ANY IMPLICATION TO THE CONTRARY. THIS PROXY STATEMENT DOES NOT CONSTITUTE A SOLICITATION OF A PROXY IN ANY JURISDICTION WHERE, OR TO OR FROM ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE A PROXY SOLICITATION.

90.     On page 105, the Proxy specified that only the following prior SEC filings of Sumo were incorporated by reference into the Proxy: (i) Annual Report on Form 10-K for the fiscal year ended January 31, 2023, filed on March 16, 2023; and (ii) Current Reports on Form 8-K filed on February 9, 2023, February 9, 2023, and February 24, 2023. The latter three Form 8-K's concerned, respectively, the announcement of the sale of Sum to Francisco Partners, and entry into the Merger Agreement, and the retirement of Robel from the Board, effective March 3, 2023.

91.     The Proxy further stated that notwithstanding incorporation by reference of the foregoing documents, information furnished under Item 2.02 or Item 7.01 of any Current Report on Form 8-K, including related exhibits, "is not and will not be incorporated by reference into

this proxy statement."

92.    Finally, the Proxy advised:

***The information included on Sumo Logic's website is not incorporated by reference into this proxy statement***. The website addresses, and the website addresses included in any documents incorporated by reference in this proxy statement, are not intended to function as hyperlinks, and the information contained on such websites and on the SEC's website is not incorporated by reference in this proxy statement and you should not consider it a part of this proxy statement.

93.    The Proxy did not incorporate by reference the Form 8-K's announcing Sumo's results in Q2 2023, Q3 2023, and Q4 2023. Nor did the Proxy incorporate by reference the transcripts for the Q2 2023 Call and the Q3 2023 Call.

**Sayar Earns $42.9 Million Upon the Closing of the Sale to Francisco Partners**

94.    The Merger closed on May 12, 2023.

95.    The closing of the Merger generated ***$42.9 million*** in cash payouts for Sayar, including $33.5 million in options that Sayar could not have instantly liquidated in a single transaction other than via a sale of Sumo, and $6.4 million in accelerated RSUs that would have otherwise vested quarterly over four years. In sum, the sale of Sumo was a massive and personally transformative cash payday for Sayar that paid him many multiples of his cash compensation in 2022 of just $712,455 (as per Sumo's 2022 Annual Proxy, which also showed that the balance of Sayar's compensation in FY 2022 of $5.35 million was virtually all in the form of RSUs that vested quarterly over four years).

96.    The payout from the Merger was significant enough for Sayar that he has apparently not assumed a new executive position since the Merger closed. Instead, according to Sayar's LinkedIn profile, Sayar is presently a "technology investor," "CEO advisor," and "Independent Board Director." In sum, Sayar's personal economic interests strongly favored an immediate sale that triggered his massive change-in-control benefits even at a lower price than continuing to execute the Company's standalone plan into the future.

**II.    The False and Misleading Omissions in the Proxy**

97.    To convince Sumo stockholders to approve the unfair Merger, Defendants caused a materially false and misleading Proxy to be disseminated to the Company's public stockholders with two key omissions that rendered statements in the Proxy concerning Sumo's results in Q3 2023 and Q4 2023 materially false and misleading. The Court's August 4 Order previously found that these two omissions—the Q3 2023 Omission and the Q4 2023 Omission—were materially false and misleading. (Dkt. No. 41 at 27-31).

**#1: The Q3 2023 Omission**

98.    When describing Sumo's results in Q2 2023, the Proxy boasted that the Company had exceeded the guidance for that quarter on three key metrics: total revenue, non-GAAP operating margin, and non-GAAP loss per share. (Proxy at 34). But when the Proxy described Sumo's Q3 2023 results three pages later, it misleadingly stated simply that "[o]n December 5, 2022, Sumo announced earnings for the third quarter of its 2023 fiscal year," *without* disclosing that the Company had also outperformed its guidance for Q3 2023 on the *same* three key metrics. (Proxy at 37).

99.    The materially false and misleading nature of the Proxy's terse description of Sumo's Q3 2023 results is evident when compared side by side to the Proxy's boastful description of the Company's Q2 2023 results:

| **Proxy's Statement Regarding Q2 FY2023** (Proxy at 34): | **Proxy's Statement Regarding Q3 FY2023** (Proxy at 37): |
|---|---|
| On August 25, 2022, Sumo Logic announced earnings for the second quarter of its 2023 fiscal year. *Sumo Logic exceeded the guidance that it had provided to the investment community with respect to Sumo Logic's total revenue, non-GAAP operating margin and non-GAAP net loss per share for that quarter*. | On December 5, 2022, Sumo Logic announced earnings for the third quarter of its 2023 fiscal year.<br><br>*[no reference to exceeding guidance]* |

100.     The omission above ("Q3 2023 Omission") was materially false and misleading because it failed to disclose that the Company had not just exceeded guidance on revenue, non-GAAP operating margin, and non-GAAP net loss per share in Q2 2023, but had also exceeded guidance on those *same* three metrics in Q3 2023, as shown in the following table.

| Q3 Guidance | Q3 Result | % Beat |
|---|---|---|
| $73.5-74.5 million revenue | $79 million revenue | 6.76% |
| Non-GAAP operating margin of (24)% to (23)% | Non-GAAP operating margin of (7)% | 70.21% |
| Non-GAAP net loss per share of $0.15 | Non-GAAP net loss per share of $0.04 per share | 73.33% |

101.     A reasonable Sumo shareholder would have assumed that if the Proxy did not disclose a guidance beat for Q3 2023 like it did for Q2 2023, then it must be because results in Q3 2023 did not beat guidance. The Q3 2023 Omission thus created the materially false and misleading impression that—as compared to Q2 2023—Sumo's performance on three key metrics had not beaten guidance in Q3 2023, which would have led Sumo shareholders to wrongly conclude that Sumo's performance and future prospects had deteriorated during the last quarter for which Sumo reported results before announcing the sale. The Proxy thus primed Sumo stockholders to accept a lower price out of fear that Sumo's future prospects had deteriorated in Q3 2023.

102.     Had the Proxy instead been truthful, and disclosed that Sumo continued to outperform guidance in Q3 2023, Sumo stockholders would have had a very different impression of the Company's prospects when they voted, and would not have voted to approve the Merger, especially for a sales price—$12.05 per share—that fell below the closing price of $12.18 per share on the day before the sale was announced.

103.     Based on the above allegations, the Court previously held that the Q3 2023 Omission was false and misleading. (Dkt. No. 41 at 28-31).

**#2: The Q4 2023 Omission**

104.    The Proxy explained that the one of the reasons that the Board recommended that Sumo shareholders vote for the Merger was because Sumo's results in Q4 2023 were purportedly "below the company's internal forecast," thus falsely implying that Sumo's results in Q4 2023 were exclusively negative. As the Proxy stated:

> ***Reasons for the Merger***
>
> The Sumo Logic Board believed that the following material factors and benefits supported its determination and recommendation [for Sumo stockholders to vote for the sale to Francisco Partners] . . .
> *Business, Financial Condition, Prospects and Execution Risks. . .*
>
> Among the potential risks identified by the Sumo Logic Board were . . .
>
> Sumo Logic's financial results for the fourth quarter of its 2023 fiscal year, ***which were below the company's internal forecast*** and analyst's estimates of Sumo Logic's financial performance on new annual recurring revenue for that period.

(Proxy at 45-46).

105.    The omission above ("Q4 2023 Omission") was materially false and misleading because it implied that the Company's results in Q4 2023 were exclusively negative when, in fact, the opposite was true—in Q4 2023 Sumo *exceeded* guidance on the same three key metrics of revenue, non-GAAP operating margin, and non-GAAP net loss per share, as shown in the following table:

| Q4 Guidance | Q4 Result | % Beat |
|---|---|---|
| $77-78 million revenue | $79.8 million revenue | 2.97% |
| Non-GAAP operating margin of (14)-(13)% | Non-GAAP operating margin of (5)% | 62.96% |
| Non-GAAP net losses per share of $0.09-$0.08 | Non-GAAP net losses per share of $0.03 | 64.71% |

106.    On top of the Q3 2023 Omission, the Q4 2023 Omission reinforced the materially false and misleading narrative in the Proxy that Sumo's performance was deteriorating. Specifically, the Q4 2023 Omission created the false impression that Sumo's performance had further *deteriorated* in Q4 2023, and was *exclusively* negative in Q4 2023, which would have led

Sumo shareholders to wrongly conclude that Sumo's performance and future prospects had continued to dramatically worsen during the first quarter reported following the announcement of the sale. The Proxy thus further primed Sumo stockholders to accept a lower price out of fear that Sumo's future prospects had continued to deteriorate.

107.    Indeed, the Q4 2023 Omission was particularly pernicious because the Proxy cited the purported deterioration of Sumo's financial performance in Q4 2023 as a reason why Defendants and the full Board recommended that Sumo shareholders vote for the Merger. Sumo shareholders had no reason to think that Defendants were misleading them about Q4 2023 results.

108.    Had the Proxy instead been truthful, and disclosed that Q4 2023 results were not exclusively negative, and instead disclosed that Sumo had *again* outperformed guidance on three key metrics in Q4 2023, Sumo stockholders would have had a very different impression of the Company's prospects when they voted, and would not have voted to approve the Merger at the unfair price offered.

109.    Based on the above allegations, the Court previously held that the Q4 2023 Omission was false and misleading. (Dkt. No. 41 at 31).

### III.    Sources of Sayar's and Sumo's Duties With Respect to Contents of Proxy

110.    Plaintiffs' Section 14(a)/Rule 14a-9 claims need only plead negligence to state a claim. Defendants Sumo and Sayar were negligent because they failed to exercise reasonable care to ensure that they complied with their legal obligations under the federal securities laws, the Merger Agreement, and Sumo's Code of Business Conduct and Ethics, dated September 2022 ("Sumo Ethics Code"), not to solicit Sumo shareholder votes via a proxy that omitted material facts rendering statements in the Proxy concerning Q3 2023 and Q4 2023 results materially false and misleading.

111.    Sayar (i) signed the proxy in his capacity as President and CEO of Sumo, (ii) served as a member of the Board that negotiated the sale to Francisco Partners and furnished the Proxy soliciting Sumo shareholders to vote for the sale, and (iii) possessed *personal knowledge* concerning the guidance and results for Q3 2023 and Q4 2023 that are at the heart of the Q3

2023 Omission and the Q4 2023 Omission, respectively (by virtue of his participation in the Q3 2023 Call and Q4 2023 Call, and participation in the preparation of the Company's press releases regarding quarterly results). Accordingly, Sayar had a duty under the federal securities laws to read and review the Proxy—especially those parts about which he had personal knowledge—so as not to permit Sumo to solicit its shareholders "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made . . . omits to state any material fact necessary in order to make the statements therein [regarding the Q3 2023 and Q4 2023 results] not false or misleading." 17 C.F.R. § 240.14a-9(a); *see also In re Maxim Integrated Prod., Inc., Deriv. Lit.*, 574 F. Supp. 2d 1046, 1066 (N.D. Cal. 2008) (directors had a duty to exercise reasonable care in ensuring that company complied with state and federal securities laws; "[t]aking Plaintiffs allegations as true, namely, that the directors issued false and misleading proxy statements, then they would have breached their duty of care."); *In re Willis Towers Watson PLC Proxy Litig.*, 439 F. Supp. 3d 704, 715 (E.D. Va. 2020) ("For the purposes of Section 14(a), 'negligence' is the failure to comply with the legal obligation not to solicit a proxy with false or misleading statements or omissions, imposed on an identified category of persons, irrespective of any subjective intent or level of diligence or care."); *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976) ("[the] directors owed a duty to the plaintiffs under section 14(a) of the Act fully and fairly to disclose the material facts in the proxy materials they issued to them").[5]

112.    Chapter 11 of the *Corporate Director's Handbook* (American Bar Association, 7th edition 2020) ("ABA Handbook") titled "Duties Under the Federal Securities Laws" provides important guidance to directors concerning the above disclosure duties, stating with respect to "Proxy Statements" that "[d]irectors should be attentive to the procedures followed in preparing the corporation's proxy statements. It is good practice for every director to review a reasonably

---

[5] While Plaintiffs do not assert a claim for breach of fiduciary duty, Sayar also owed a duty as the director and CEO of a Delaware corporation to ensure that the Proxy fully and fairly disclosed all information material to Sumo shareholders' votes. *See Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 446-47 & n.2 (Del. Ch. 2023) (citing cases).

close-to-final draft of the proxy statement before it is distributed or filed with the SEC, ***particularly sections dealing with matters about which the director has personal knowledge*** . . ."[6]

113.    Likewise, Chapter 4 of the ABA Handbook titled "Risk Oversight and Compliance, states with respect to "Disclosures":

> The corporation's disclosure documents (e.g., annual reports, quarterly reports, current reports, ***proxy statements***, prospectuses, earnings releases, and investor presentations) must fairly present and ***not omit material information about the corporation and its business, financial condition, results, prospects, and risks***. Management is responsible for drafting and preparing the corporation's disclosures, and many public companies establish management disclosure committees with responsibility for preparing the corporation's SEC filings and other public financial disclosures. Although management has responsibility for a corporation's financial statements, the audit committee has oversight responsibility over all financial disclosures. In any case, the board should assure that the corporation's procedures for identifying matters requiring disclosure and preparing disclosure documents are reasonably designed to produce accurate and complete public disclosures in an appropriate and timely manner. In addition to the disclosure documents requiring their signatures, directors should be familiar with all the corporation's significant disclosure documents and assure that those documents convey all material information about the business in a legally compliant and timely manner.

114.    Beyond his duty of disclosure under the federal securities laws, Sayar also signed the Merger Agreement on behalf of Sumo in his capacity as President and CEO of Sumo. Under Section 6.3(g)(i) of the Merger Agreement, Sumo had a contractual obligation not to file a proxy "omit[ting] to state any material fact required to be stated therein or necessary in order to make the statements therein [regarding the Q3 2023 and Q4 2023 results], in light of the circumstances under which they are made, not false or misleading."

115.    Further, the Sumo Ethics Code required Sayar, as CEO, to ensure that public filings by Sumo like the Proxy were complete, accurate and compliant with all applicable laws before disseminating them to shareholders. In particular, the Sumo Code stated as follows at pages

---

[6] *See also Dentons Public MA CLE* (October 2021) (concerning the "Background of the Merger" section of a proxy, "[b]ecause this section can be the most difficult to draft, a working draft of this section should be started by counsel early in the process and circulated for ***review by those persons most knowledgeable about the events described*** before finalizing the merger proxy statement. ***Frequently this section requires substantial input from the target company's and buyer's management, directors (in some cases), and financial and legal advisors because of the fact intensive nature of the disclosure***.")

3, 8-9:

**GENERAL STANDARDS OF CONDUCT**
**Overview**

We expect you to ***comply with applicable laws and to act in an honest*** and ethical manner in all dealings with Sumo Logic, our customers, our partners, our vendors, ***our stockholders***, or other employees. ***You are responsible for your own conduct.*** No one has the authority to make you violate this Code, and any attempt to direct or otherwise influence someone else to commit a violation is unacceptable.

**Compliance with Laws**

***You are responsible for complying with all laws, rules, and regulations applicable to the conduct of our business, as well as with all Sumo Logic policies and procedures. You should familiarize yourself with the legal requirements related to your responsibilities such that you can recognize potential dangers and know when to seek advice. In some instances, this may include understanding legal requirements related to*** antitrust, privacy and data security, government contracting, export controls, anti-corruption and anti-bribery laws, ***securities laws***, and/or immigration compliance. We encourage you to ask questions regarding compliance with laws and our policies. ***No matter where you are located, you must comply with the laws, rules, and regulations of the United States and applicable laws of other jurisdictions. Disregarding the law or engaging in unlawful activity will not be tolerated by Sumo Logic. Violations of laws, rules, regulations, and orders may subject you to individual criminal or civil liability***, in addition to discipline by the Company. ***Violations may also subject the Company to civil*** or criminal ***liability*** or the loss of business.

**PUBLIC COMMUNICATIONS AND FINANCIAL MATTERS**

**Public Communications and Filings**

Sumo Logic files reports and other documents with regulatory authorities, including the SEC and the Nasdaq Stock Market. In addition, we make a variety of other public communications, such as press releases.

***Depending upon your position, you may be asked to provide information to help ensure that our public filings and communications are complete, fair, accurate, and understandable***. You're expected to use reasonable efforts to provide complete, accurate, objective, relevant, timely, and understandable answers to questions about our public disclosures. You must also use reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely, and understandable disclosure in our reports and other public communications.

If you believe that any public disclosure is materially misleading, or if you become aware of any material information that you believe should be disclosed to the public, it's your responsibility to inform the Company's General Counsel or Chief Financial Officer. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report it immediately through the reporting channels described above. See "Introduction – Reporting Violations" for more information.

***Compliance with Policies, Controls, and Procedures***

You are expected to act responsibly and exercise good judgment with respect to our finances and financial reporting. You must execute financial transactions only with authorization and in compliance with Sumo Logic's policies. You are also expected to honestly and accurately record and report all financial transactions and business information, comply with our system of internal controls, and follow applicable laws, regulations, and accounting practices.

**IV.    Defendants Were Negligent Because They Failed to Use Reasonable Care to Fulfill Their Duties**

116.    Sayar signed the Proxy as President and CEO. He also participated as a member of the Board in (i) evaluating the proposals from Francisco Partners and other bidders in meetings of the full Board, (ii) negotiating the sale to Francisco Partners (including meeting with Franciso Partners on October 10, 2022, and November 16, 2022), and (iii) soliciting Sumo shareholders to vote for the Merger.

117.    Moreover, by virtue of his participation in the Q2 2023 Call and the Q3 2023 Call, and participation in the preparation of the Company's press releases regarding quarterly results, Sayar had *personal knowledge* concerning the guidance and results for Q3 2023 and Q4 2023 that are at the heart of the Q3 2023 Omission and the Q4 2023 Omission, respectively. Thus, under the federal securities laws, the Merger Agreement, and the Sumo Code of Ethics, Sayar had a duty to exercise reasonable care to read and review the Proxy before distributing it to Sumo shareholders—especially with respect to those parts of the narrative about which he had personal knowledge—so as to ensure that the Proxy distributed to Sumo shareholders did not contain any material omissions like the Q3 2023 Omission and the Q4 2023 Omission that rendered statements in the Proxy materially false and misleading.

118.    Sayar breached his duty as CEO and a member of the Board not to solicit Sumo

shareholders via a materially false and misleading proxy. In particular, by virtue of his participation in the Q2 2023 Call and the Q3 2023 Call, and participation in the preparation of the Q2 2023 and Q3 2023 Releases—which gave him *personal knowledge* concerning the guidance and results for Q3 2023—Sayar should have noticed and corrected the Q3 2023 Omission. More specifically, by virtue of his participation on the Q2 2023 and Q3 2023 Call, and participation in the preparation of the Q2 2023 and Q3 2023 Releases, Sayar knew that Sumo's Q3 2023 results beat guidance on the three key metrics of revenue, non-GAAP operating margin and non-GAAP loss per share. Thus, Sayar should have known that it was materially false and misleading for the Proxy not to disclose this guidance beat in its discussion of Q3 2023 results, after the Proxy boasted just three pages earlier about beating guidance on those same three metrics in Q2 2023.

119.    The Q3 2023 Omission appeared in the "Background of the Merger" section of the Proxy, which fell within Sayar's area of responsibility, as they were matters about which he had personal knowledge by virtue of his participation in the evaluation and negotiation of the sale to Francisco Partners, as well as his participation on the Q2 2023 Call and the Q3 2023 Call, and his participation in the preparation of the Q2 2023 and Q3 2023 Releases. In particular, the "Background of the Merger" section of the Proxy specifically references Sayar multiple times, including disclosing Sayar's review of Francisco Partners' initial June 3 proposal at the Board meeting held on June 8, 2022, and Sayar's participation in meetings with Francisco Partners on October 10, 2022, and November 16, 2022. Additionally, since Sayar was a member of the Board, it is reasonable to infer that Sayar participated in all meetings of the full Board concerning the sales process referenced in the Proxy (since the Proxy does not state otherwise). Finally, as CEO of Sumo, Sayar was at all relevant times Sumo's most senior executive, and thus it is reasonable to infer that Sayar participated in all of the meetings of the Corporate Governance Committee concerning the sales process identified in the Proxy that reference attendance by "members of Sumo Logic management" (since the Proxy does not state otherwise).

120.    By virtue of his participation on the Q3 2023 Call, and his participation in the preparation of the Q3 2023 Release and Q4 2023 Release, and as Sumo's CEO—which gave him

*personal knowledge* concerning the guidance and results for Q4 2023—Sayar should have noticed and corrected the Q4 2023 Omission. More specifically, by virtue of his participation on the Q3 2023 Call, and participation in the preparation of the Q3 2023 and Q4 2023 Releases, Sayar knew that Sumo's Q4 2023 results again beat guidance on the same three key metrics of revenue, non-GAAP operating margin and non-GAAP loss per share. Thus, Sayar should have known that it was materially false and misleading for the Proxy not to disclose this beat in its discussion of Q4 2023 results, instead of stating only that Q4 2023 results were below the company's internal forecast, and thus falsely portraying Sumo's results in Q4 2023 as exclusively negative.

121.    The Q4 2023 Omission appearing in the "Reasons for the Merger" section of the Proxy—which lists the reasons why the Board recommended that Sumo stockholders vote for the Merger—fell within Sayar's area of responsibility, as they were matters about which he had personal knowledge by virtue of his role as CEO, and membership on the Board, as well as his participation on the Q3 2023 Call (discussing guidance for Q4 2023), and his participation in the preparation of the Q3 2023 and Q4 2023 Releases. Indeed, the Proxy discloses that, on February 2, 2023, "members of Sumo management and representatives of Morgan Stanley" separately met with "representatives of Francisco Partners and Sponsor D" to "discuss Sumo's anticipated business and financial results for the fourth quarter of its 2023 fiscal year." Since Sayar was CEO, and thus the most senior executive at Sumo, it is reasonable to infer that Sayar attended both the meeting with Francisco Partners and the meeting with Sponsor D.

122.    Sayar also took responsibility for the Proxy by signing it. Above his signature in the Proxy, Sayar instructed shareholders to "***[p]lease read the proxy statement and its annexes, including the merger agreement**, **carefully and in their entirety**, **as they contain important information**.*" Yet, despite being a major Sumo shareholder himself, Sayar failed to read the Proxy "carefully and its entirety," including areas about which he had personal knowledge. If Sayar had read the Proxy "carefully and in its entirety" as he urged other Sumo stockholders to do, Sayar would have noticed the Q3 2023 Omission and the Q4 2023 Omission—because he had personal knowledge of those subjects—and corrected those omissions before the Proxy was

distributed to Sumo stockholders.

123.    In sum, at a minimum, Sayar negligently violated Section 14 and Rule 14a-9. Sayar's negligence is imputed to Sumo. *E.g., In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015); see also *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.,* 780 F. App'x 480, 485 (9th Cir. 2019).

## V.    Loss Causation: Sumo Shareholders Suffered Economic Loss as a Result of the False and Misleading Statements in the Proxy

124.    The Q3 2023 and Q4 2023 Omissions caused Sumo's stockholders economic loss by misleading them about Sumo's performance in Q3 2023 and Q4 2023, and priming them to accept a sale that underpriced their shares by creating the false impression that Sumo's performance had deteriorated in Q3 2023 and Q4 2023. Had the Proxy been truthful and disclosed that Sumo's performance beat guidance on three key metrics in Q3 2023 and Q4 2023, and not deceived Sumo shareholder about such performance, Sumo shareholders would not have voted to approve the Merger at the $12.05 price offered by Francisco Partners, which would have caused Francisco Partners to increase its offer, allowed Sponsor A (or one of the other potential bidders) to make a superior offer, or enabled the stockholders to keep their shares in a Company whose value was greater than the price paid in the Merger. Under any of those scenarios, Sumo shareholders would have obtained or maintained greater value than the price they received for their shares.

125.    In particular, as the Court held in the August 4 Order (Dkt. No. 41 at 35), the fact that the $12.05 per share paid by Francisco Partners was less than Sumo's $12.18 closing price on the day before the merger announcement adequately alleges that the sales price undervalued Sumo, and caused economic loss.

126.    Furthermore, Defendants' misconduct caused Sumo shareholders to lose out on alternative options that offered greater value, including the $13.00 expression of interest conveyed by Sponsor A. In particular, Sponsor A was unable to timely proceed with due diligence to support its potential bid of $13.00 per share because it was initially ignored or rebuffed, and only given to access to the data room on January 31, 2023, at which point

Defendant Sayar and the rest of Board were already racing to finalize the Merger with Francisco Partners. Sayar and the rest of the Board could have easily provided Sponsor A with a reasonable amount of time to finalize its diligence and proceed with its offer, especially after Francisco Partners refused to offer a price "in the teens" (as the Corporate Governance Committee had sought on January 26, 2023), and then later rejected the Corporate Governance Committee's request to pay a sales price that represented a premium to Sumo's closing stock price on the trading day prior to announcement of a transaction. Instead, despite Francisco Partners rebuffing their request for a sales price at a premium to Sumo's stock price, Defendants and the rest of the Board capitulated and raced to transact with Francisco Partners at a sale price below the last closing price of Sumo stock, and then solicited shareholders to accept the undervalued price via a proxy statement that misled shareholders regarding Sumo's financial performance and prospects.

127.    Alternatively, Defendant Sayar and the rest of the Board could have continued to execute on the Company's stand-alone plan, as the Board was determined to do in June 2022, after reviewing Francisco Partners' initial June 3 proposal of $11.00 per share, and rejecting it as "not at a compelling valuation." Indeed, the final sales price of $12.05 per share represented an increase of only 9.5% over Francisco Partners' initial June 3 bid of $11.00 per share. Defendant Sayar and the rest of the Board accepted this paltry increase in February 2023, despite two consecutive quarters—Q2 2023 and Q3 2023—in which Sumo beat guidance on three key metrics, and awareness no later than February 2, 2023 (when Sumo management met with Francisco Partners and Sponsor D to discuss Q4 2023 results), that Sumo's Q4 2023 results would also beat guidance on all three key metrics.

128.    Moreover, Defendants failed to pursue another potentially more valuable alternative by rejecting the overture from Financial A on January 16, 2023, which was interested in making a minority investment in Sumo and thus would have allowed stockholders to maintain their equity in the Company. For Sayar, however, that would be unappealing, as a minority investment would have precluded him from liquidating all of his equity interests in the Company.

129.    Additionally, the Company's stand-alone plan offered shareholders greater value

than the Merger Consideration. Indeed, one equity research analyst (Blair Abernethy of Rosenblatt Securities) had a price target for Sumo of $18.00 per share as of January 20, 2023, and analyst Matthew Hedberg of RBC Capital Markets assigned the Company a price target of $12.00 per share (as published by Bloomberg on December 6, 2022) based on the "strength of the Company's platform" and "clean" execution. Neither of these targets would have included a control premium, the price paid by a buyer for the value of gaining control over a company's operations.

130.    Further, Morgan Stanley analyst Sanjit Singh described the Company's revenue and operating margins as impressive, and Jefferies analyst Brent Thrill described the Company's topline performance as "particularly strong."

131.    Additionally, as of February 9, 2023, the average analyst price target for Sumo was $12.58, and the highest target was $21.00. These targets further indicate that shareholders suffered financial loss when they had their shares cashed out for the Merger Consideration of just $12.05 per share.

132.    Furthermore, according to a discounted cash flow analysis performed by analysts from Simply Wall Street on February 24, 2023, Sumo had an estimated fair value of $18.34. The analyst indicated that Sumo was undervalued by the market by 35%.

133.    Moreover, shareholders' shares were worth $18.98 based on Wall Street analysts' projections, and $15.31 based on management's Projections. Thus, shareholders suffered financial loss when they had their shares cashed out for the Merger Consideration of just $12.05 per share.

134.    Lastly, while Defendants cited the availability of appraisal rights as one of the material factors that supported their decision to approve the Merger (Proxy at 47), as a result of the materially false and misleading Proxy, Sumo shareholders were deceived into foregoing their appraisal rights under Delaware law. If the Proxy had not deceived shareholders regarding the Company's fair value and the reasonableness of the Projections, a sufficient number of shareholders would have elected to exercise their appraisal rights under Delaware law, and would have received more than the $12.05 Merger Consideration in an appraisal, as the Company's fair value exceeded the Merger Consideration.

## **CLASS ACTION ALLEGATIONS**

135.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all other similarly situated former public stockholders of Sumo as of the record date for voting on the Merger of April 3, 2023, who were harmed by Defendants' actions alleged herein (the "Class") by receiving less than full value for their shares when the Merger closed. Excluded from the Class are: (i) Sayar and members of his immediate family; (ii) the officers and directors of the Company and members of their immediate families; and (iii) any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

136.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of the April 3, 2023 record date to vote on the Merger, there were 124,088,187 shares of Sumo common stock outstanding and entitled to vote, held by hundreds to thousands of individuals and entities dispersed throughout the country. The actual number of former public stockholders of Sumo will be ascertained through discovery;

(b)     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including: (i) whether Defendants misrepresented or omitted material information from the Proxy in violation of Section 14(a) of the Exchange Act; (ii) whether Defendant Sayar violated Section 20(a) of the Exchange Act; and (iii) whether the Class suffered damages.

(c)     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to

individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CLAIMS FOR RELIEF

### COUNT I
**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

137.     Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

138.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

139.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

140.     Sayar signed the Proxy and Defendants caused the Proxy containing the above-

referenced materially false and misleading omissions to be disseminated to Sumo's shareholders, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

141.    By virtue of his (i) signing the Proxy, and urging Sumo shareholders to read the Proxy carefully in its entirety because it contained important information, (ii) signing the Merger Agreement on behalf of Sumo (which obligated Sumo not to file a false and misleading Proxy), (iii) position within the Company as President, CEO, and a director bound by the Sumo Code of Ethics, (iv) participation in either or both such capacities in numerous meetings to evaluate and negotiate the sale to Francisco Partners, and (v) participation in the Q2 2023 and Q3 2023 Calls, and preparation of the Q2 2023, Q3 2023, and Q4 2023 Releases, Sayar had a duty to exercise reasonable care in his review and approval of the Proxy that he would be signing (especially portions about which he had personal knowledge), not to sign off on false and misleading statements in the Proxy concerning Sumo's results in Q3 2023 and Q4 2023, and to instead disclose all material information concerning Sumo's results in Q3 2023 and Q4 2023, necessary for Sumo stockholders to cast informed votes.

142.    Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Sayar did not exercise reasonable care since he failed to carefully review the Proxy (especially those portions about which he had personal knowledge), and instead acted negligently in signing the Proxy with false and misleading omissions concerning Sumo's results in Q3 2023 and Q4 2023 (about which Sayar had personal knowledge), which induced Sumo stockholders to vote in favor of the Merger by creating the misleading impression that Sumo's performance had deteriorated in the aforementioned quarters.

143.    Sayar's negligence is imputed to Sumo.

144.    The omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Sumo stockholder would have considered them important in deciding whether or not to vote in favor of the Merger.

145.    Since the Proxy advised that Sumo could not consummate the Merger unless the proposal to adopt the Merger Agreement was approved by the affirmative vote of the holders of a majority of the shares of Sumo common stock issued and outstanding, the Proxy soliciting the

votes of Sumo stockholders was an essential link in the accomplishment of the Merger.

146.     As a direct and proximate result of the dissemination of the materially false and misleading Proxy that the Defendants used to obtain shareholder approval of the Merger, Plaintiffs and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the closing of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II
### Against Sayar for
### Violations of Section 20(a) of the Exchange Act

147.     Plaintiffs incorporate and repeat each and every allegation above as if fully set forth herein.

148.     By virtue of his position as President and CEO of Sumo, and a member of the Sumo Board that negotiated the sale to Francisco Partners, Sayar acted as a controlling person of Sumo within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of his position as Sumo's President and CEO and a director of Sumo, and participation in, and/or awareness of Sumo's financial performance, prospects, and operations, and/or duty with respect to the contents of the Proxy filed with the SEC (especially with respect to those portions of the Proxy about which he had personal knowledge), Sayar had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sumo with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially misleading.

149.     Sayar was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected, had Sayar carefully read and reviewed the Proxy, as was his duty.

150.     As President and CEO of Sumo, and a member of the Sumo Board, Sayar had

direct and supervisory involvement in the evaluation and negotiation of the Merger and the preparation of the Proxy, and he signed the Proxy, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. Moreover, the Proxy was signed by Sayar as President and CEO of Sumo, and in that capacity, Sayar urged all shareholders to carefully read the Proxy in its entirety because it contains "important information." For all of these reasons, Sayar was thus directly involved in the making of the false and misleading statements and omissions challenged herein.

151. In addition as described herein, Sayar was involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that Sayar reviewed and considered in connection with such negotiation, review and/or approval.

152. By virtue of the foregoing, Sayar had the ability to exercise control over and did control persons whom or an entity which violated Section 14(a), by the acts and omissions as alleged herein. By virtue of his position as a controlling person, Sayar is liable pursuant to Section 20(a) of the Exchange Act.

153. As a direct and proximate result of the conduct of Sayar and the misleading Proxy that the Defendants used to obtain shareholder approval of the Merger, Plaintiffs and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Sayar is liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B. Awarding Plaintiffs and the Class all damages sustained as a result of Defendants' wrongdoing, including, but not limited to, compensatory and/or rescissory damages..

1        C.      Awarding Plaintiffs and the Class pre-judgment and post-judgment

2  interest on any damages award.

3        D.      Granting Plaintiffs and the Class the costs and disbursements of this

4  action, including reasonable attorneys' fees, expert fees, and expenses;

5        E.      Awarding extraordinary and/or equitable relief as permitted by law,

6  equity, and the federal statutory provisions sued upon hereunder; and

7        F.      Granting such other and further relief as this Court may deem just and

8  proper.

9                          **JURY DEMAND**

10     Plaintiffs demand a trial by jury on all issues so triable.

11  Dated: September 27, 2024            Respectfully submitted,

12

                                   */s/ Juan E. Monteverde*

13                               Juan E. Monteverde

14

**KAHN SWICK & FOTI LLC**        **MONTEVERDE & ASSOCIATES PC**

15  Michael J. Palestina (*pro hac vice*)    Juan E. Monteverde (*pro hac vice*)
    1100 Poydras Street, Suite 960      Miles D. Schreiner

16  New Orleans, LA 70163          Jonathan T. Lerner
    Tel: (504) 455-1400            The Empire State Building

17  michael.palestina@ksfcounsel.com    350 Fifth Avenue, Suite 4740
                               New York, NY 10118

18  *Counsel for Co-Lead Plaintiffs and*   Tel: (212) 971-1341
    *Co-Lead Counsel for the Putative*     jmonteverde@monteverdelaw.com

19  *Class*                            mschreiner@monteverdelaw.com
                                jlerner@monteverdelaw.com

20

**WOHL & FRUCHTER LLP**

21  Joshua E. Fruchter           **MONTEVERDE & ASSOCIATES PC**
    25 Robert Pitt Drive, Suite 209G    David E. Bower (SBN 119546)

22  Monsey, NY 10952           600 Corporate Pointe, Suite 1170
    Tel: (845) 290-6818            Culver City, CA 90230

23  jfruchter@wohlfruchter.com      Tel: (213) 446-6652
                                dbower@monteverdelaw.com

24  *Additional Counsel for Lead Plaintiff*

25  *Ranjit Kapil*                 *Counsel for Co-Lead Plaintiffs and Co-*
                              *Lead Counsel for the Putative Class*

26

27

28